**MITCHELL NICHOLAS, Appellant/Defendant**
**v.**
**PEOPLE OF THE VIRGIN ISLANDS, Appellee/Plaintiff**

S. Ct. Criminal No. 2009-0022
Supreme Court of the Virgin Islands
June 6, 2012

719

721

723

EDWARD L. BARRY, ESQ., Law Offices of Edward L. Barry, St. Croix, USVI, *Attorney for Appellant.*

TERRYLN M. SMOCK, ESQ., Assistant Attorney General, St. Thomas, USVI, *Attorney for Appellee.*

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and SWAN, *Associate Justice.*

## OPINION OF THE COURT

### (June 6, 2012)

HODGE, *Chief Justice.* Appellant Mitchell Nicholas challenges, on numerous grounds, the Superior Court's January 10, 2008 Judgment and Commitment,[1] which adjudicated him guilty of various offenses stemming from the death of Georgia Gottlieb. For the reasons that follow, we reverse Nicholas's conviction for unlawfully possessing ammunition, but affirm the Judgment and Commitment in all other respects.

## I. STATEMENT OF FACTS AND PROCEDURAL POSTURE

The underlying criminal investigation began on July 29, 2005, when Gottlieb failed to report to work, yet her friends and relatives received telephone calls throughout the day from Gottlieb's cell phone that would last only a minute or two, with the caller always remaining silent. (J.A. 96-98, 98, 150, 157-59 159, 199-202.) After Charmaine Joseph — Gottlieb's niece — received such a call, but did not otherwise hear from Gottlieb that day, she visited her apartment at approximately 5:00 p.m. When she received no response despite knocking on the doors and windows, she called the 9-1-1 emergency operator, who dispatched the police. (J.A. 99.) Shortly after their arrival, the police forced the door open and discovered Gottlieb's body with a single gunshot wound to the back of her head. (J.A. 244, 393.) Upon learning this news, Joseph told the police that she saw Nicholas — who was Gottlieb's boyfriend and the

---

[1] The trial court signed the Judgment and Commitment on December 27, 2007, but it was entered on January 10, 2008.

father of her minor son — with her aunt the prior night, and that she believed he killed her. (J.A. 100.)

The police requested assistance from the Federal Bureau of Investigation after Joseph informed them about the unusual phone calls and that Gottlieb and Nicholas had a minor son, D.N., who was not in the apartment and whose whereabouts were unknown. That same night, the FBI obtained Gottlieb's cell phone records and notified the police that a call had been made from her cell phone to the Bella Vista Hotel. But when officers visited the hotel, no personnel were on duty and the police could not otherwise find anyone who could confirm whether Nicholas had registered as a guest. Therefore, they decided to reconvene the next morning. (J.A. 320-23.) At about 6:00 am on July 30, 2005, police officers and FBI agents went to the hotel and were told by the front desk clerk that Nicholas checked in at 10:57 a.m. the prior day with a little boy and was staying in Room 205. (J.A. 188.)

Although the police used a master key to unlock Room 205, a battering ram was necessary to gain entrance because a chain had been latched across the door. In the room, the police found a boy — later identified as D.N. — as well as Nicholas, who was half lying in bed with a gun in his hand. The police instructed Nicholas to drop the gun and, once he complied, they secured him and removed D.N. from the room. During their search of the room, the police recovered the gun — a Glock firearm — as well as Gottlieb's cell phone. (J.A. 290-91, 300, 326.) Later, at a high school parking lot, they discovered Gottlieb's vehicle, which contained her purse in the trunk.

The police arrested Nicholas, and the People of the Virgin Islands charged him with first-degree murder, unauthorized possession of a firearm during the commission of a crime of violence, assault in the first degree, and unauthorized possession of ammunition.[2] On March 26, 2007, Nicholas filed a motion to suppress various pieces of evidence. Although the Superior Court ultimately excluded evidence recovered from a certain rental vehicle that was shown to have been used by Nicholas on the day of the shooting, it refused to suppress any of the evidence found in the hotel room or on Nicholas's person because exigent

---

[2] In violation of the following provisions of the Virgin Islands Code, respectively: 14 V.I.C. §§ 921, 922(a)(1); 14 V.I.C. § 2253(a), 14 V.I.C. § 295(1), and 14 V.I.C. § 2256(a).

circumstances justified the police entry into, and search of, the hotel room without a warrant. Shortly thereafter, the People filed a motion *in limine* to permit certain hearsay testimony by Gottlieb's friends and relatives. The Superior Court, however, did not issue a written decision before trial began on October 1, 2007. Instead, the Superior Court held a hearing between preliminary jury instructions and opening statements, in which it orally held that it would not permit hearsay testimony.

The People presented its case-in-chief on October 2, 2007 and October 3, 2007. At trial, the People introduced testimony relating to the phone calls, the discovery of Gottlieb's body, and the incident at the hotel, including the recovery of D.N., the gun, and Gottlieb's cell phone. Moreover, the People presented testimony from Gottlieb's neighbors, who testified to seeing Nicholas drive up to Gottlieb's apartment in her car in the morning of July 29, 2005, and then leave the apartment in a hurry with the boy and Gottlieb's handbag, with one neighbor testifying that she heard a "sound like a gunshot" around 7:00 a.m. (J.A. 114, 119, 125-27, 134.)

The jury, however, also heard significant testimony from Joseph and five of Gottlieb's friends: Marie Pinney, Glenn Davis, Elba Richardson, Venus Green, and Paul Jones. Several of these witnesses testified that Gottlieb had been having a series of relationship problems with Nicholas, which escalated the week before her death, when she evicted him from her apartment, packed his bags, changed the lock to her apartment, and disabled the combination lock to her car. (J.A. 126-27, 145, 146, 173-74, 205, 223.) Pinney testified that Gottelib had missed an appointment to go shopping with her the weekend before the murder, but appeared the next day at Pinney's apartment, disheveled. Pinney further testified that Gottelib had been home with Nicholas, "couldn't get out of her house," and had to develop a ruse to escape and go to Pinney's home. (J.A. 558.) Pinney also testified that she created a code system with Gottlieb so that Gottlieb could signal if she needed help, and that Pinney offered to allow her to stay at her home. (J.A. 271.) In addition, Richardson testified that she saw Gottlieb with bruises the week before her death, and attributed the bruises to a scuffle with Nicholas. (J.A. 161-62.) Moreover, Pinney, Joseph, and Green all testified that they urged Gottlieb to get a temporary restraining order against Nicholas, with Green testifying that, the week before her death, Gottlieb showed her "a recording device" plugged into the wall of her apartment. (J.A. 209-10, 102-03.) During trial, several of

these witnesses also attributed positive personality traits to Gottlieb, such as calling her loving and self-giving, (J.A. 141, 151), while also testifying about various negative aspects of Nicholas's personality and behavior, including that he had made sexual overtures to other women. (J.A. 104-05, 166.) Furthermore, on at least six occasions, these witnesses expressly testified, notwithstanding their lack of personal knowledge, that Nicholas killed Gottlieb. (J.A. 100, 147, 200-01, 238, 553.)

The People also called D.N. as a witness. D.N. testified that Gottlieb had told him to take a shower that morning, and that he heard a loud noise after he finished his shower. He further testified that, when he went to Gottlieb's room to discover the source of the noise, he encountered Nicholas, who blocked him from entering the room and, when D.N. asked Nicholas about the sound, told him that he did not know what it was and directed him to get dressed. (J.A. 627-28.) In addition, D.N. testified that Nicholas first drove him to a beach near the St. John ferry, and told him that they were going "to see if [Gottlieb] was on the boat." (J.A. 629.) However, when again asked by D.N. about the sound he heard from the shower, Nicholas now responded that Gottlieb had reached for a comforter and it fell. (J.A. 631.) D.N. then explained that Nicholas took him to a fast food restaurant, used Gottlieb's bank card to take out cash from an ATM, and took him to a high school parking lot, where Nicholas left Gottlieb's vehicle and walked across the street to his job, where Nicholas called a woman to pick them up. (J.A. 631-34.) According to D.N., this woman dropped them off near a white Jeep — which the police later identified as a rental vehicle — that Nicholas used to drive back to the beach area — purportedly to see if Gottlieb was on the next ferry — and eventually to the Bella Vista Hotel. (J.A. 634-36.) Additionally, D.N. testified that, during the week before Gottlieb's murder, he saw Nicholas with a firearm and heard him say, in reference to the home that he shared with Gottlieb, that he wanted to burn the "F***ing house down." (J.A. 647-48.)

After the People rested their case and Nicholas declined to present any evidence, the Court recessed until October 4, 2007, when the jury received its final jury instructions and began its deliberations. That same day, the jury found Nicholas guilty of all four counts. The Superior Court orally sentenced Nicholas on December 7, 2007, and signed a written Judgment and Commitment on December 27, 2007, which was not

entered until January 10, 2008.[3] Nicholas timely filed a *pro se* notice of appeal on December 7, 2007.[4] *See* V.I.S.CT.R. 5(b)(1).

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

"The Supreme Court [has] jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court. . . ." V.I. CODE ANN. tit. 4 § 32(a). An order is considered to be "final" for purposes of this statute if it "ends the litigation on the merits, leaving

---

[3] The Superior Court sentenced Nicholas to life imprisonment for first-degree murder and to twenty years imprisonment for possession of an unlicensed firearm, with those sentences to run concurrently. In addition, the Superior Court sentenced Nicholas to five years imprisonment for unauthorized possession of ammunition, to run consecutively with the murder and unlicensed firearm sentences, and merged the first-degree assault conviction with the murder charge.

[4] At the December 7, 2007 sentencing hearing, the Superior Court orally permitted Nicholas's court-appointed trial attorneys to withdraw and directed the Clerk of the Superior Court to prepare and file a *pro se* notice of appeal for Nicholas. However, the oral order was never memorialized in a subsequent written order, nor noted by the Clerk of the Superior Court in the record of proceedings or on the list of certified docket entries. Although the Clerk of the Superior Court did prepare a *pro se* notice of appeal on the same day and filed it in the Superior Court, the notice of appeal was not timely transmitted to this Court; rather, the notice of appeal was not sent to this Court until March 10, 2009. Furthermore, the Clerk of the Superior Court never notified this Court that both of Nicholas's trial attorneys had been permitted to withdraw from their representation, and instead only transmitted, with the notice of appeal, a copy of the original order of appointment. When Nicholas's trial attorneys failed to file any documents with this Court in conjunction with this appeal, this Court issued a June 7, 2010 Show Cause Order. Significantly, it was only after the trial attorneys ordered a copy of the December 7, 2007 sentencing hearing transcript and filed their responses to the June 7, 2010 Show Cause Order that this Court became aware that the Superior Court had permitted them to withdraw as counsel and that it was necessary for this Court to appoint appellate counsel, which occurred on July 13, 2010.

As a result of the delay by the Superior Court's failure to timely transmit Nicholas's notice of appeal and erroneous transmission of the original order of appointment without notifying this Court of the December 7, 2007 oral order permitting withdrawal, the processing of this appeal was delayed for nearly three years, during which time Nicholas remained incarcerated pursuant to the December 27, 2007 Judgment and Commitment. This Court, in response to the delay in this and similar delays in other cases, has amended Supreme Court Rule 4(a), promulgated Supreme Court Rule 210.3(a), and taken other steps to attempt to prevent a situation like this from occurring again in the future. Although we ultimately affirm Nicholas's first-degree murder conviction and the corresponding sentence of life imprisonment, we cannot emphasize enough that such a significant delay in the processing of a criminal appeal, caused solely by the failure to perform ministerial duties, is simply unacceptable and we expect that the actions taken will avoid such occurrences in the future.

nothing else for the court to do except execute the judgment." *Williams v. People*, 55 V.I. 721, 727 (V.I. 2011). Because the Superior Court's January 10, 2008 Judgment and Commitment is a final judgment, we have jurisdiction over Nicholas's appeal. *See, e.g., Browne v. People*, S. Ct. Crim. No. 2010-0069, 2012 V.I. Supreme LEXIS 9, at *6 (V.I. Feb. 2, 2012) (stating that in a criminal case, written judgment embodying the adjudication of guilt and the sentence imposed on that adjudication constitutes a final judgment for purposes of 4 V.I.C. § 32(a)); *Melendez v. People*, S. Ct. Crim. No. 2010-0071, 2012 V.I. Supreme LEXIS 8, at *6 (V.I. Feb. 2, 2012) (same).

The standard of review for this Court's examination of the Superior Court's application of law is plenary, while findings of fact are reviewed for clear error. *St. Thomas-St. John Bd. of Elections v. Daniel*, 49 V.I. 322, 329 (V.I. 2007); *see also People v. John*, 52 V.I. 247, 255 (V.I. 2009) (quoting *United States v. Shields*, 458 F.3d 269, 276 (3d Cir. 2006)) (applying this standard to a review of a trial court's denial of a motion to suppress), *aff'd*, 654 F.3d 412, 55 V.I. 1324 (3d Cir. 2011).

When reviewing a challenge to the sufficiency of the evidence supporting a conviction, we view all issues of credibility in the light most favorable to the People. *Latalladi v. People*, 51 V.I. 137, 145 (V.I. 2009). If " 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,' " we will affirm. *DeSilvia v. People*, 55 V.I. 859, 865 (V.I. 2011) (quoting *Mendoza v. People*, 55 V.I. 660, 667 (V.I. 2011)). The evidence offered in support of a conviction "need not be 'inconsistent with every conclusion save that of guilt, so long as it establishes a case from which a jury could find the defendant guilty beyond a reasonable doubt.' " *Mulley v. People*, 51 V.I. 404, 409 (V.I. 2009) (quoting *United States v. Carr*, 25 F.3d 1194, 1201 (3d Cir. 1996)). A defendant seeking to overturn his conviction on this basis bears " 'a very heavy burden.' " *Latalladi*, 51 V.I. at 145 (quoting *United States v. Losada*, 674 F.2d 167, 173 (2d Cir. 1982)).

Moreover, unless its decision involves application of a legal precept — in which case we would exercise plenary review — we review the Superior Court's evidentiary decisions for abuse of discretion. *Corriette v. Morales*, 50 V.I. 202, 205 (V.I. 2008). An abuse of discretion occurs if the decision "rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Stevens v. People*, 55 V.I. 550, 556 (V.I. June 22, 2011).

Nevertheless, when a criminal defendant fails to object to a Superior Court decision or order, this Court ordinarily only reviews for plain error, provided that the challenge has been forfeited rather than waived. *See* V.I.S.CT.R. 4(h); *see also Francis v. People*, 52 V.I. 381, 390 (V.I. 2009). For this Court to reverse the Superior Court under the plain error standard of review, "there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.' " *Id.* (quoting *Johnson v. United States*, 520 U.S. 461, 466-67, 117 S. Ct. 1544, 137 L. Ed. 2d 718 (1997)). However, even "[i]f all three conditions are met," this Court may reverse the Superior Court "only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 390-91.

## B. Sufficiency of the Evidence

■ Nicholas, for his first issue on appeal, contends that the evidence is insufficient to sustain his convictions for first-degree murder and unlawful possession of ammunition. Since section 2256 of title 14 of the Virgin Islands Code, as it existed at the time Nicholas was charged, generally criminalized possession of ammunition "unless authorized by law" but provided no means to obtain such authorization, the People could not have proven that Nicholas committed this offense. *See, e.g., Brown v. People*, 55 V.I. 496, 501 (V.I. 2011); *Stevens v. People*, 52 V.I. 294, 309 (V.I. 2009). Therefore, we reverse the conviction for unauthorized possession of ammunition.

■ With respect to the murder charge, Nicholas argues that the People failed to present any evidence establishing that he killed Gottlieb with premeditation. We disagree. This Court defined premeditation in *Brown v. People*, 54 V.I. 496, 507 (V.I. 2010) (quoting *Gov't of the V.I. v. Martinez*, 780 F.2d 302, 305 (3d Cir. 1985)).[5] In his brief, however, Nicholas invited the Court to clarify our definition of premeditation, which was borrowed from a decision by the Third Circuit in a Virgin Islands case forty-six

_____

[5] In the jury instructions below, the court stated that "[t]o say that something is done with premeditation means that something is done with some reflection, planning or deliberation, no matter how brief." (J.A. 777.) The court went on to further describe the mental state as requiring deliberation, which "involves giving consideration and reflection upon a preconceived design to kill, turning it over in your mind, and giving it second thought, but the accused need not have brooded over his plan to kill or entertained it for any considerable period of time." (*Id.*) This instruction, while not an exact repetition of this Court's broad explanation of the concept in *Brown*, is nonetheless consistent with it.

years ago. *Gov't of the Virgin Islands v. Lake*, 362 F.2d 770, 776, 5 V.I. 594 (3d Cir.1966). (Appellant's Br. 52-52 n.23.) In *Brown*, we stated that " '[t]o premeditate a killing is to conceive the design or plan to kill. A deliberate killing is one which has been planned and reflected upon by the accused and is committed in a cool state of the blood, not in sudden passion engendered by [the] just cause of provocation.' " *Id.* at 507 (quoting *Gov't of the V.I. v. Martinez*, 780 F.2d 302, 305 (3d Cir. 1985)).

Nicholas raises two arguments involving this definition. First, he argues that the language from *Brown, Martinez* and *Lake* juxtaposes the concepts of premeditation and "the just cause of provocation" as though the absence of one proves the presence of the other. We do not agree. Although a cursory reading of that language from *Brown* tenuously supports Nicholas's proposition, a closer reading of *Brown* shows that the language was intended simply to distinguish the two concepts as opposite ends of a spectrum, not to create an either/or dichotomy. *See id.* at 506-07. Indeed, the opinion in *Brown* specifically lists "lack of provocation" as only one of several kinds of evidence that can be used to show the existence of premeditation. *Id.* at 506 ("Premeditation, however, may be established by circumstantial evidence, including: the nature of the weapon used, *lack of provocation*, the defendant's conduct before and after the killing . . . .") (emphasis added) (quoting 40A AM. JUR. 2d *Homicide* § 448)). The circumstances and arguments raised in *Brown* did not provide this Court with an opportunity, or any need, to draw distinctions between premeditated murder in the first degree, murder in the second degree, and voluntary manslaughter.

Nevertheless, Nicholas's arguments in this case provide us with exactly that opportunity. Nicholas argues that the jury should have found provocation and thus convicted him of voluntary manslaughter, and even if there was not sufficient evidence to find provocation, that there was insufficient evidence for the jury to find the premeditation requirement of first-degree murder and thus the jury should have found second-degree murder. (Appellant's Br. 52.)

Both first- and second-degree murder in the Virgin Islands require an unlawful killing that must be committed with "malice aforethought." 14 V.I.C. § 921. In the Virgin Islands, malice aforethought

> does not mean simply hatred or particular ill will, but extends to and embraces generally the state of mind with which one commits a

wrongful act. It may be inferred from circumstances which show a wanton and depraved spirit, a mind bent on evil mischief without regard to its consequences. And "where the killing is proved to have been accomplished with a deadly weapon, malice can be inferred from that fact alone."

*Gov't of the V.I. v. Sampson*, 94 F. Supp. 2d 639, 42 V.I. 247, 253 (D.V.I. App. Div. 2000) (quoting *Gov't of the V.I. v. Knight*, 764 F. Supp. 1042, 26 V.I. 280, 290 (D.V.I. 1991)). The difference between first-[6] and second-degree murder is that first-degree murder requires a killing done with malice aforethought and which was "willful, deliberate, and premeditated." 14 V.I.C. §§ 921; 922(a)(1). *See also Gov't of the V.I. v. Rosa*, 399 F.3d 283, 295 n.13 (3d Cir. 2005) ("First-degree murder is distinguishable from second-degree murder in that to prove second-degree murder it is not necessary to prove deliberation and premeditation."). As we described in *Brown*, premeditation is

the deliberate formation of and reflection upon the intent to take a human life, and involves the mental process of thinking beforehand, deliberation, reflection, weighing, or reasoning *for a period of time, however short*. Premeditation, however, may be established by circumstantial evidence, including: the nature of the weapon used, lack of provocation, the defendant's conduct before and after the killing, threats and declarations of the defendant before and during the occurrence, or the dealing of lethal blows after the deceased was felled and rendered helpless. Other relevant factors include ill will or previous difficulties between the parties, evidence that the killing was done in a brutal manner, the nature and number of the victim's wounds, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing . . . . The premeditation required for a first-degree murder conviction is not inferred from the use of a deadly weapon alone . . . .

---

[6] There are other forms of first-degree murder not relevant to this appeal, including murder "by means of poison, lying in wait, torture, [or] detonation of a bomb" or murder committed in the perpetration of certain crimes or against certain public servants. 14 V.I.C. § 922.

54 V.I. at 506-07 (emphasis omitted, alterations in original) (quoting 40A AM. JUR. 2D *Homicide* § 448)). *See also id.* at 507 ("[T]o premeditate a killing is to conceive the design or plan to kill. A deliberate killing is one which has been planned and reflected upon by the accused and is committed in a cool state of the blood, not in sudden passion engendered by [the] just cause of provocation."); *Rosa*, 399 F.3d at 296-97 (ruling that the trial court properly instructed the jury that premeditation is "typically associated with murder in cold blood . . . "). Because first-degree murder requires proof of a more serious level of mental culpability beyond that of actual malice, the punishment for first-degree murder is more serious than that for second-degree murder. *Compare* 14 V.I.C. § 923 (a) ("Whoever commits murder in the first degree shall be imprisoned for his natural life without parole."); *with* 14 V.I.C. 923(b) (permitting a trial court to sentence an individual convicted of second-degree murder to any term with a minimum of five years or a minimum of ten years if the victim was a law enforcement officer engaged in the line of duty at the time of the killing).

▮ Manslaughter, on the other hand, is an unlawful killing without malice aforethought. *See* 14 V.I.C. § 924. Manslaughter comes in two forms: voluntary and involuntary. *Id.* Voluntary manslaughter — the only kind raised by Nicholas in this case — is a killing done "upon a sudden quarrel or heat of passion," a requirement that was known at the common law as provocation. *Id. See* 40 C.J.S. *Homicide* § 108 (defining provocation as "[p]assion . . . as would cause an ordinary person to act on impulse and without reflection. Stated otherwise, the passion must be irresistible, or such as to render the person beyond the power of self-control.") (footnotes omitted). The law treats manslaughter more leniently than second-degree murder because the defendant acted under the heat of passion and accordingly acted without the malice aforethought necessary for murder. *See* 14 V.I.C. § 925 (setting the punishment for voluntary manslaughter at any term of years up to ten years, unless the victim was a law enforcement officer engaged in the line of duty at the time of the killing, in which case the maximum term is fifteen years); 40 C.J.S. *Homicide* § 35 ("[T]he essential element of voluntary manslaughter that distinguishes it from second degree murder is whether the killing was committed in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.").

For his second premeditation challenge Nicholas argues that the *Brown* definition of premeditation blurred the distinction between second- and first-degree murder because it stated that premeditation could take a "brief moment." (Appellant's Br. 52 n.23.) To support his position, Nicholas cites to a treatise, which states "that to 'speak of premeditation and deliberation which are ̦ instantaneous, or which take no appreciable time, . . . destroys the statutory distinction between first and second degree murder . . .' " (*Id.* (quoting 2 W. LaFave & A. Scott, Jr., Substantive Criminal Law § 7.7(a), at 286 (1986)). However, the description of premeditation cited in *Brown* did not imply that premeditation could happen "instantly" or without an "appreciable" amount of time; instead, it stated that "[a]lthough the mental processes involved must take place prior to the killing, a brief moment of thought may be sufficient to form a fixed, deliberate design to kill." 54 V.I. at 506-07.

■■■ As *Brown* correctly states, and as we now emphasize here, it is not the quantity of time that determines whether or not a killing is the result of premeditation; instead, it is the fact of deliberation before the homicidal act. As a number of courts interpreting the nearly identical federal statute for first-degree murder[7] have stated, and with which we concur, whether or not premeditation has occurred — and whether there was sufficient time for such a thought process — is a question that requires an examination of the circumstances surrounding the murder. *See, e.g., Rosa*, 399 F.3d at 296-97 (considering the Virgin Islands first-degree murder statute, and approving instructions in which the trial court stated that "[a]ny interval of time between the forming of the specific intent to kill and th[e] execution of that intent which is of sufficient duration for the accused to be truly conscious and mindful of

---

[7] Section 1111 of Title 18 of the U.S. Code provides that "[m]urder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing . . . is murder in the first degree." With nearly identical language, section 922 of Title 14 of the V.I. Code states that "[a]ll murder which — (1) is perpetrated by means of poison, lying in wait, torture, detonation of a bomb or by any other kind of willful, deliberate and premeditated killing . . . is murder in the first degree." Because the statute providing for the federal crime of first-degree murder is nearly identical to ours, federal cases interpreting it can be useful. *See People v. Pratt*, 50 V.I. 318, 322 (V.I. 2008) (stating that when the language of a federal and local statute are very similar, federal case law may be instructive when interpreting the local law).

what he intended willfully to set about to do is to justify a finding of premeditation."); *see also United States v. Rogers*, 457 Fed. Appx. 268, 270 (4th Cir. 2011) (noting that " '[w]hile the amount of time for reflection may vary, it is the fact of deliberation, of second thought[,] that is important.' " (quoting *United States v. Sinclair*, 301 Fed. Appx. 251, 255 (4th Cir. 2008) )); *United States v. Begay*, 673 F.3d 1038, 1042-43 (9th Cir. 2011) (noting that the Ninth Circuit's model jury instructions state that "[t]he amount of time needed for premeditation of a killing depends on the person and the circumstances. It must be long enough, after forming the intent to kill, for the killer to have been fully conscious of the intent and to have considered the killing."); *accord United States v. Catalan-Roman*, 585 F.3d 453, 474 (1st Cir. 2009). Therefore, *Brown's* reference to a "brief moment" was not an incorrect statement of the law; nevertheless, we emphasize that premeditated murder requires evidence — which may be circumstantial — that the defendant actually deliberated and fully considered the killing before carrying it out. Whether the accused did so within the span of a "brief moment" or over a longer period of time, it is the fact of deliberation which must be proved in order to convict a defendant of premeditated murder.

 In summary, then, we take this opportunity to address Nicholas's argument directly, reaffirm our language and holding in *Brown*, and provide guidance on the differences in the required mental states between first-degree murder, second-degree murder, and voluntary manslaughter: that first-degree murder requires both malice aforethought and proof that the defendant deliberated and reflected upon his decision to kill and carried it out in cold blood; that second-degree murder requires only malice aforethought; and that voluntary manslaughter requires proof that the defendant acted under a passion such that it rendered him incapable of forming the necessary malice aforethought. *See People v. Mendoza*, 468 Mich. 527, 664 N.W.2d 685, 689-94 (Mich. 2003).

 Turning now to Nicholas's sufficiency challenge in this case with that applicable law in mind, Nicholas nevertheless cannot overcome his " 'very heavy burden' " in his sufficiency challenge to his conviction for first-degree murder. *Latalladi*, 51 V.I. at 145 (quoting *United States v. Losada*, 674 F.2d 167, 173 (2d Cir. 1982)). The jury could have rationally inferred, based on Nicholas's action of pointing a firearm at his ex-girlfriend's head and pulling the trigger, that Nicholas had the wanton disregard for human life necessary for actual malice. *See Sampson*, 42 V.I.

at 253 (quoting *Knight*, 26 V.I. at 290). Indeed, the use of the gun alone could be sufficient for a finding of actual malice.[8] *See id.* (quoting *Knight*, 26 V.I. at 290). Despite the fact that the People argued to the jury that Nicholas committed the act in a "jealous[ ]rage[]", (J.A. 705), and that there was testimony concerning the ongoing problems between the couple to support that argument, the jury was free to disregard both and find actual malice and we are constrained in a sufficiency challenge to view the evidence in the light most favorable to upholding the jury's verdict. *See Latalladi*, 51 V.I. at 145.

Likewise, Nicholas points to evidence in the record from which the jury could have inferred a lack of premeditation, and thus argues the jury was limited to convicting him of second-degree murder. (*See* Appellant's Br. 52-53 (including the fact that the gun was not purchased in anticipation of the crime, Nicholas failed to take a single personal item from the home after the crime, he was a boat captain but did not make use of his access to water transportation to escape, and that he checked into the hotel under his own name).)

However, Nicholas ignores the evidence in the record from which the jury could have inferred its presence. The People presented evidence that Gottlieb had taken steps to evict Nicholas from her apartment and otherwise remove him from her life, (J.A. 145-46; 205), and that — well before she was murdered — Nicholas said, in reference to the home that they shared, that he wanted to burn the "F***ing house down." (J.A. 648.) *See Brown*, 54 V.I. at 506 (noting that premeditation can be proved by, *inter alia*, evidence of "ill will or previous difficulties between the parties" or "threats and declarations of the defendant before and during the occurrence" (quoting 40A AM. JUR. 2D *Homicide* § 448 (Feb. 2010)). Perhaps most significantly, D.N. testified that he did not hear any argument before he heard the sound of a gunshot, (J.A. 661), and in any event the fact that Gottlieb was shot in the back of the head, (J.A. 393), is inconsistent with a struggle, self-defense, or a heat-of-passion killing. *See State v. Spears*, 184 Ariz. 277, 908 P.2d 1062, 1074-75 (Ariz. 1996) (noting that a shot to the back of the head is "inconsistent with a heat-of-passion murder"); *see also Brown*, 54 V.I. at 506 (stating that "the

---

[8] As we noted in *Brown*, the use of a gun alone is not sufficient to support an inference of premeditation, 54 V.I. at 507, but it can support an inference of actual malice. *Sampson*, 42 V.I. at 253.

nature of the weapon used", "lack of provocation" and "the use of a deadly weapon on an unarmed victim" are all factors that weigh towards a finding of premeditation). We recognize that the use of a firearm alone is not sufficient to permit an inference of premeditation, *Brown*, 54 V.I. at 507,[9] however, coming to the scene of a murder with a loaded weapon may constitute evidence of that the accused in fact considered the plan to kill prior to committing the act itself. *See United States v. Begay*, 673 F.3d 1038, 1044 (9th Cir. 2011) (" '[T]hat appellant entered the apartment with a loaded gun . . . permitted an inference that appellant arrived on the scene already possessed of a calmly planned and calculated intent to kill.' " (quoting *Belton v. United States*, 382 F.2d 150, 152, 127 U.S. App. D.C. 201 (D.C. Cir. 1967))). Furthermore, after Gottlieb was shot, Nicholas immediately stepped out from Gottlieb's bedroom to block D.N.'s access, and he had a rental car waiting to swap with Gottlieb's car at the harbor. All of these facts could lead a jury to infer that Nicholas planned the homicide in advance. Accordingly, although Nicholas points to evidence that tends to refute a finding of premeditation, other evidence on the record is sufficient for a reasonable jury to conclude beyond a reasonable doubt that Nicholas premeditated Gottlieb's murder. *DeSilvia*, 55 V.I. at 865.

## C. Fourth Amendment Challenge

Nicholas also argues that the Superior Court erred when it denied his motion to suppress with respect to the warrantless search of Nicholas's person and his hotel room. Specifically, Nicholas contends that exigent circumstances were not present due to the eleven-hour gap between the initial police visit to the Bella Vista Hotel on the evening of July 29, 2005, and the subsequent visit on the morning of July 30, 2005. According to

---

[9] For this proposition, see also *State v. Pierce*, 260 Kan. 859, 927 P.2d 929, 937 (Kan. 1996) (noting that the Kansas Supreme Court has "held that the element of premeditation is not inferred from use of a deadly weapon alone"); *State v. Melton*, 307 N.C. 370, 298 S.E.2d 673, 677 (N.C. 1983) (stating that while the use of a gun may support a finding of malice, "the use of a gun *by itself* does not establish premeditation and deliberation") (emphasis added); *see also* C. R. McCorkle, Annotation, *Homicide: Presumption of Deliberation or Premeditation from the Circumstances Attending the Killing*, 96 A.L.R.2d 1435 (collecting cases) ("It appears to be generally agreed that the fact that the killing was effected by use of a deadly weapon is not, of itself, a sufficient basis for a legal presumption that it was deliberate or premeditated.").

Nicholas, the police could have easily obtained a warrant during this period, and the police officers' decision to "call it a day" when they could not locate any hotel staff — rather than remaining at the hotel overnight for surveillance — demonstrates that the police did not believe they were faced with an emergency situation.

■ The Fourth Amendment[10] prohibits unreasonable searches and seizures, and "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967); *Simmonds v. People*, 53 V.I. 549, 556 (V.I. 2010) (citing *United States v. Karo*, 468 U.S. 705, 714-15, 104 S. Ct. 3296, 82 L. Ed. 2d 530 (1984)). The Fourth Amendment's limitations on searches apply with equal force to hotel rooms. *Hoffa v. United States*, 385 U.S. 293, 301, 87 S. Ct. 408, 17 L. Ed. 2d 374 (1966) ("A hotel room can clearly be the object of Fourth Amendment protection as much as a home or an office."); *United States v. Coles*, 437 F.3d 361, 365 (3d Cir. 2006) (citing *Stoner v. California*, 376 U.S. 483, 490, 84 S. Ct. 889, 11 L. Ed. 2d 856 (1964)). To justify a warrantless intrusion into someone's hotel room absent consent, the People must show both probable cause and exigent circumstances. *Simmonds*, 53 V.I. at 560 (citing *Coles*, 437 F.3d at 365-66). Although the burden of proving that a search or seizure was unlawful normally rests with the defendant, *United States v. Stearn*, 597 F.3d 540, 551 (3d Cir. 2010), when the police conduct a search or seizure without a warrant, the burden shifts to the government to prove exigent circumstances or another exception to the warrant requirement. *United States v. Headen*, 264 Fed. Appx. 244, 246 (3d Cir. 2008) (citing *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995)).

■ Since Nicholas does not contend that the police lacked probable cause, we limit our analysis solely to application of the exigent circumstances exception. Like all exceptions to the warrant requirement,

---

[10] The Fourth Amendment of the U.S. Constitution applies to the U.S. Virgin Islands by virtue of Section 3 of the Revised Organic Act. *Simmonds v. People*, 53 V.I. 549, 555 & n.3 (V.I. 2010). The complete Revised Organic Act of 1954 is found at 48 U.S.C. §§ 1541-1645 (2006), *reprinted in* V.I. CODE ANN., Historical Documents, Organic Acts, and U.S. Constitution at 73-177 (1995 & Supp. 1997) (preceding V.I. CODE ANN. tit. 1).

the exigency exception is "carefully delineated." *Welsh v. Wisconsin*, 466 U.S. 740, 749-50, 104 S. Ct. 2091, 80 L. Ed. 2d 732 (1984). "In these limited situations, the need for effective law enforcement trumps the right of privacy and the requirement of a search warrant, thereby excusing an otherwise unconstitutional intrusion." *Coles*, 437 F.3d at 366.

■■■ A finding regarding the presence or absence of exigent circumstances is a factual one, *see Coles*, 437 F.3d at 366 (citing *United States v. Richard*, 994 F.2d 244, 248 (5th Cir. 1993)), and we cannot conclude that the Superior Court clearly erred in this matter. While Nicholas repeatedly asserts in his appellate brief that the police had an eleven-hour window to obtain a search warrant, this is simply incorrect. An affidavit in support of a warrant, as well as the warrant itself, must state with particularly the place to be searched.[11] When the police arrived at the Bella Vista Hotel on the evening of July 29, 2005, they did not know whether Nicholas had even registered as a guest — let alone his room number — and did not obtain this information until they spoke with the front desk clerk the following morning. Without this information, any application for a search warrant[12] the police could have sought during this eleven-hour period would have been denied for failing the particularity

---

[11] Revised Organic Act § 3 ("No warrant for arrest or search shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.").

[12] We recognize that the police not only failed to obtain a search warrant, but also arrested Nicholas without first obtaining an arrest warrant. We agree that the police certainly could have sought an arrest warrant from a Superior Court judge in the hours after discovering Gottlieb's body, *see* 5 V.I.C. § 3504, but note that, since the police clearly possessed reasonable cause for believing Nicholas to have committed a felony, they were permitted, by statute, to arrest him without a warrant, 5 V.I.C. § 3562(3), so long as they had probable cause to believe he was inside the hotel room. *United States v. Veal*, 453 F.3d 164, 167 (3d Cir. 2006). Moreover, even if the police lacked probable cause to arrest Nicholas without a warrant — which we do not hold — we have previously explained that "United States Supreme Court precedent would preclude voiding his conviction as a remedy, but only authorize suppression of any evidence obtained as the 'fruit' of the illegal arrest as the remedy." *Phipps v. People*, 54 V.I. 543, 550 n.5 (V.I. 2011) (citing *Gerstein v. Pugh*, 420 U.S. 103, 109, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975)). Here, none of the evidence against Nicholas was obtained as a result of a search of his person incident to his arrest, since Nicholas was holding the firearm in his hand at the time the police entered Room 205 and the remaining piece of incriminating evidence — Gottlieb's cell phone — was not found on Nicholas, but in plain view in the hotel room.

element or, if granted, subsequently declared void as fatally overbroad.[13] *See Jacobs v. City of Chicago*, 215 F.3d 758, 767-71 (7th Cir. 2000) (holding that a warrant is overbroad if it authorizes a search of an entire multi-unit building, and officers lack probable cause to believe that there is illegal activity occurring in each separate unit, or that the entire building is under the "dominion and control" of the person targeted for the search) (citing *Maryland v. Garrison*, 480 U.S. 79, 86-87, 107 S. Ct. 1013, 94 L. Ed. 2d 72 (1987)). Thus, we only review whether exigent circumstances existed on the morning of July 30, 2005, when the front desk clerk informed the police that Nicholas was staying in Room 205 with a "little boy."

 Here, the police clearly possessed exigent circumstances at the time they entered the hotel room. "Circumstances involving the protection of a child's welfare, even absent suspicions of criminal activity, may present an exigency permitting warrantless entry, but only if the officer reasonably believes that 'someone is in *imminent* danger.' " *Ray v. Twp. of Warren*, 626 F.3d 170, 177 (3d Cir. 2010) (quoting *Parkhurst v. Trapp*, 77 F.3d 707, 711 (3d Cir. 1996)).[14] At the time the police gathered the

---

[13] We note that at the suppression hearing the Superior Court conducted in response to Nicholas's motion, a police officer testified that a warrant was not sought because the police did not believe they could obtain one at such a late hour on a weekend. (S.A. 213, 231.) We strongly emphasize, however, that this excuse is insufficient from a constitutional perspective, since a judge must always be available to review and issue warrants, even on weekends. We echo the United States Court of Appeals for the District of Columbia Circuit when, in 1977, it gave that court "some pause" that the police believed they could not get a warrant in less than an hour and a half to two hours. *United States v. Johnson*, 561 F.2d 832, 835, 843, 182 U.S. App. D.C. 383 (D.C. Cir. 1977). *But see United States v. Wihbey*, 75 F.3d 761, 766 (1st Cir. 1996) (holding that it was not clearly erroneous to believe it would take substantially longer than two hours to obtain a search warrant on a Saturday morning). As the D.C. Circuit noted in *Johnson*, advancements in technology have made the application for a warrant less time consuming. Rule 41 of the Federal Rules of Criminal Procedure — which applies to searches in the Territory by virtue of Title 5, Section 3901 of the Virgin Islands Code — permits the issuance of warrants based on oral testimony and even by telephone. FED. R. CRIM. P. 41(d)(2)(C), (3). Therefore, had the police possessed the relevant information relating to Nicholas's location some hours before the entry and search of the hotel room, the fact that the investigation came to a head in the early hours of a weekend would not have excused the requirement to obtain a warrant. Notably, it was the practice of the Superior Court at the time to have judges on-call on the weekends to deal with emergencies and to issue warrants if necessary.

[14] *But see Michigan v. Fisher*, 558 U.S. ___, 130 S. Ct. 546, 548, 175 L. Ed. 2d 410 (2009) (stating that the relevant question is not what the officer believed but whether there was "an

relevant information — that Nicholas was in Room 205 of the Bella Vista Hotel with his son — they had reason to believe that D.N. witnessed his mother's murder and may, in fact, have been the only eyewitness. (S.A. 144.) They knew that a gun was used in the killing but was not left at the crime scene. (S.A. 172.) The police had statements from neighbors establishing that Nicholas entered the apartment that morning. (S.A. 238.) Shortly after he entered, the neighbors heard the sound of a gunshot and a loud thump, and Nicholas was seen leaving the apartment in a hurry with his son. (S.A. 143, 144, 200; J.A. 113-15.) Although the police had no evidence that Nicholas ever threatened his son, they knew that he had both a motive and the opportunity to silence his son, the only likely eyewitness. Therefore, the police acted reasonably and the trial court correctly found that exigent circumstances justified the warrantless entry and search. *See United States v. Thompson*, 357 Fed. Appx. 406, 411 (3d Cir. 2009) (finding exigent circumstances where witnesses to a shoot-out saw a participant to the crime pull a child out of a bullet-ridden vehicle and enter an apartment); *United States v. Parris*, 229 Fed. Appx. 130, 135 (3d Cir. 2007) (determining that it was reasonable for police to enter a home without a warrant where a man who had been firing a weapon outside the house had entered the home, where children were inside and appeared afraid, and where the police could not see inside well enough to determine if anyone was injured or being held against their will); *State v. Aviles*, 277 Conn. 281, 891 A.2d 935, 945 (Conn. 2006) (concluding that police acted reasonably when they entered the room of someone suspected of having committed murder within the last twelve hours and where the murder weapon had not yet been recovered, because the assailant might still have possessed the gun and might still have been willing to use it); *Columbus v. Montgomery*, 2011 Ohio 1332, ¶ 39 (Ohio Ct. App. 2011) (unpublished) (finding exigent circumstances where children may have been sexually abused and were inside an apartment, possibility with the alleged assailant, even though there was no evidence of ongoing violence).

 "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous," and if the Superior Court's "account of the evidence is plausible in light of the

---

'objectively reasonable basis for believing' " that exigent circumstances existed (quoting *Brigham City v. Stuart*, 547 U.S. 398, 406, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006))).

record viewed in its entirety, [this Court] may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985). Thus, we hold that it was not "clear error" for the trial court to find exigent circumstances under the circumstances presented.

## D. Evidentiary Issues

Nicholas devotes the vast majority of his sixty-page brief to challenging numerous aspects of the testimony rendered by Pinney, Green, Joseph, Richardson, Davis, and Jones. Some of these assignments of error, however, are referred to only in a perfunctory manner unsupported by argument and citation to authority and are thus waived.[15] *See* V.I.S.CT.R. 22(m); *Bernhardt v. Bernhardt*, 51 V.I. 341, 346 (V.I. 2009). In addition, Nicholas analyzes some alleged errors under both the Uniform Rules of Evidence ("URE") — which were in effect at the time of his trial — and the Federal Rules of Evidence, which the Superior Court erroneously applied to the exclusion of the URE. *See Phillips v. People*, 51 V.I. 258, 273 (V.I. 2009). Moreover, some challenges either lack merit[16] or involve testimony that, while perhaps not admissible for

---

[15] To give one example, Nicholas challenges Pinney's testimony about Nicholas allegedly confining Gottlieb in their home, (J.A. 558), by simply stating that such testimony "is a Pandora's Box of inadmissible opinions, adverse character testimony, and sinister speculation against the accused — all of it facilitated by backdoor hearsay, and none of it substantiated by any competent, specific evidence." (Appellant's Br. 42.) Although Nicholas cites to the prohibition on propensity evidence elsewhere in his brief, he does not apply that rule to Pinney's testimony regarding Gottlieb's confinement or otherwise develop the argument in any meaningful way. Nevertheless, even if Nicholas has not technically waived this issue, we decline to find plain error because, following Pinney's statements, the court instructed the jury not to consider the evidence at all as to Nicholas's guilt "of this or any other crime." (J.A. 558.)

[16] For example, although Nicholas contends that one of the police officers who testified should not have been allowed to describe the police's uncertainty — at the time of the hotel incident — about whether Nicholas would do bodily harm to D.N. or use D.N. as leverage to evade law enforcement, (J.A. 282), such evidence is clearly relevant to explaining the course of investigation and educating the jury as to why the officers made the decision to enter Nicholas's hotel room the morning after the murder without a warrant. *See Ryan v. Miller*, 303 F.3d 231, 253 (2d Cir. 2002) (observing that "course of investigation" testimony may be relevant when it "offer[s] an explanation for something about which the jury would be curious"); *People v. Rice*, 321 Ill. App. 3d 475, 747 N.E.2d 1035, 1041, 254 Ill. Dec. 623 (Ill. App. Ct. 2001) (acknowledging that testimony regarding investigatory procedures may be

the reasons given by the Superior Court at trial, is obviously admissible under a different evidentiary rule.[17] Under these circumstances, we limit our analysis solely to the evidentiary challenges that possess at least superficial plausibility or otherwise warrant an explanation.

### 1. *Gottlieb's Bruises, Fear of Nicholas, and the Tape Recorder*

According to Nicholas, the Superior Court erred when it permitted (1) Richardson to testify that she saw bruises on Gottlieb's body and to attribute those bruises to a "scuffle" with Nicholas, (2) Pinney to testify about the code system she created with Gottlieb, (3) Joseph and Green to testify that they urged Gottlieb to get a temporary restraining order against Nicholas, (4) Officer Tyson to testify that law enforcement was concerned because they did not know if Nicholas intended to harm his son; and (5) Green to testify that Gottlieb showed her "a recording device" plugged into the wall of her apartment. Nicholas, among other things,[18] argues that these pieces of evidence constituted inadmissible hearsay.

---

admissible). We note that modern-day jurors may well understand the general warrant requirement and it may have been important to the People to show that there was an urgent situation regarding the boy's safety.

[17] For instance, we agree with Nicholas's argument that Pinney's testimony relating Gottlieb's explanation of why she could not meet Pinney at the store constitutes hearsay because it was not based on personal knowledge, but find that the statement was clearly · admissible under a different provision in the URE permitting the admission of

> a statement narrating, describing or explaining an event or condition which the judge finds was made by the declarant at a time when the matter had been recently perceived by him and while his recollection was clear, and was made in good faith prior to the commencement of the action.

5 V.I.C. § 932(4).

[18] In his appellate brief, Nicholas also contends that all of this evidence constituted impermissible evidence of prior bad acts. Nicholas never objected to this testimony on prior bad acts grounds, and thus we review the challenge solely for plain error. *Francis*, 52 V.I. at 390. In this case, evidence of prior instances of domestic violence by Nicholas against Gottlieb could arguably have been necessary to prove premeditation — an element of first-degree murder that Nicholas disputes on appeal — and to explain to the jury why Gottlieb had evicted Nicholas from their shared apartment, as well as why Nicholas would respond to the eviction by killing Gottlieb. We note that several appellate courts have held that testimony relating to prior instances of domestic violence is admissible to prove motive, intent, and to explain the actions of the victim. *See, e.g., Albrecht v. Horn*, 485 F.3d 103, 127-28 (3d Cir. 2007) (stating that evidence of past instances of abuse was "admitted for a legitimate purpose, that is, to show [defendant's] motive for deliberately starting the fatal fire"); *Mitchell v. United States*, 629 A.2d 10, 13 (D.C. 1993) ("Where one spouse or partner in a relationship commits a crime against the other, any fact or circumstance relating to ill-feeling; ill-treat-

As a threshold matter, we must determine the appropriate standard of review for these hearsay challenges. While Nicholas contemporaneously objected to some of this testimony on hearsay grounds, he did not object to other testimony that involved the same subject matter. For instance, while Nicholas objected, on hearsay grounds, to Joseph's testimony that she urged Gottlieb to get a temporary restraining order, he failed to object to the same testimony rendered by Green. (J.A. 102-03, 209-10.) Moreover, while Nicholas obtained a favorable ruling from the Superior Court at the hearing on the People's motion *in limine* with respect to hearsay testimony, and now contends on appeal that the identification of the device in Gottlieb's apartment as a "recording device" violated this ruling, Nicholas failed to contemporaneously object, request a mistrial, or otherwise inform the Superior Court that the People elicited testimony that he believed violated the earlier pre-trial ruling. *See Jones v. State*, 2006 OK CR 5, 128 P.3d 521, 539 (Okla. Crim. App. 2006) (reviewing issue for plain error when counsel failed to lodge contemporaneous object on grounds that testimony violated prior favorable ruling on motion *in limine*); *Gonzales v. State*, 685 S.W.2d 47, 50 (Tex. Crim. App. 1985) ("For error to be preserved with regard to the subject matter of [a] motion in limine, it is absolutely necessary that an objection be made at the time when the subject is raised during trial."). Thus, all of these evidentiary issues — except Nicholas's challenge to the bruise testimony — are reviewable solely for plain error. *See Francis*, 52 V.I. at 390.

---

ment; jealousy; prior assaults; personal violence; threats, or any similar conduct or attitude by the [spouse] are relevant to show motive and malice in such crimes."); *Dennis v. State*, 817 So.2d 741, 761-62 (Fla. 2002) (holding evidence that defendant stalked, threatened, and assaulted woman whom he eventually killed did not constitute inadmissible prior bad acts, since evidence necessary to prove motive and intent); *State v. Patterson*, 200 Kan. 176, 434 P.2d 808, 813-14 (Kan. 1967) ("The evidence of the discordant marital relationship between the defendant and [the victim], his previous assaults on her, including his threats to kill her, was competent as bearing on the defendant's motive and intent, particularly since this is a case of marital homicide"); *State v. Johnson*, 163 P.3d 695, 701, 2007 UT App 184 (Utah Ct. App. 2007) (prior acts of domestic violence admissible to explain why witness's statement to the police differed from her testimony at trial). Nevertheless, even if this Court were inclined to depart from these authorities, the absence of any prior guidance from this Court, combined with the existence of such extensive case law permitting such evidence — including from the United States Court of Appeals for the Third Circuit — would defeat the second prong of the plain error test. *See Murrell v. People*, 54 V.I. 338, 366 (V.I. 2010) (explaining that an error is "plain" only if the error is clear under current law, and thus "there can be no plain error where there is no precedent . . . directly resolving it.") (quoting *United States v. Lejarde-Rada*, 319 F.3d 1288, 1291 (11th Cir. 2003)).

■ Even if we were to assume, without deciding, that admission of the code system, temporary restraining order, law enforcement speculation as to Nicholas's intent, and recording device testimony constituted error, Nicholas has failed to establish that the third prong of the plain error test — that the error affected Nicholas's substantial rights — has been satisfied. *Id.* With respect to the code system and temporary restraining order testimony, the jury could have concluded that, because Gottlieb did not use the code system or heed her friends' advice to seek a restraining order, her relationship with Nicholas was not as bad as portrayed by the People. In other words, the testimony cuts both ways, in that while it may have been unfavorable to Nicholas, it could also have potentially benefited him. As to the recording device testimony, the jury could have permissibly inferred from Green's description of the device and its proximity to the phone line — which was personally observed by Green and thus clearly admissible — that the device was meant to record Gottlieb's calls. Additionally Nicholas had the opportunity to cross-examine Green as to what experience — if any — she or Gottlieb had with recording devices, yet did not do so. *See Blyden v. People*, 53 V.I. 637, 656 (V.I. 2010) (considering whether testimony was important in the context of the whole trial, when analyzing whether its admission was harmless); *United States v. Roberts*, 419 Fed. Appx. 155, 162 (3d Cir. 2011) (finding that the defendant's ability to cross-examine a witness regarding improperly admitted hearsay evidence weighed towards a determination that the error was harmless).

■ As to Officer Tyson's testimony that before they reached the hotel, the law enforcement officers were concerned for the safety of D.N., there is similarly no evidence that this testimony affected Nicholas's substantial rights. Here, the officer did not say that he and the other officers believed Nicholas would harm the child, but instead relayed that "we did not know the mind set [sic] of Nicholas at that point in time . . . and we did not know if the intent was to do bodily harm to the minor child or to use the minor child as a means of leverage to get away from law enforcement." (J.A. 282). While such speculation on the part of the officers was not relevant to any fact at issue and therefore should have been excluded, Nicholas declined to object to the statements, or cross-examine the officer about the testimony. Furthermore, jurors would have intuitively understood that the police would have been concerned for the safety of the sole potential witness to a murder when that witness was removed

from the scene by the person suspected of committing that crime. Finally, and most importantly, the evidence was not important in the context of the whole trial, as there was substantial amount of properly admitted evidence to support a finding that Nicholas killed Gottlieb; it is highly unlikely the brief testimony by Officer Tyson regarding the officers' thought process as to D.N.'s safety made any difference in the minds of the jurors. *See Blyden*, 53 V.I. at 656 (noting that the court should consider the importance of the testimony in the context of the whole trial to determine whether its admission was harmless).

■■■ With respect to the testimony as to Gottlieb's bruises, which is reviewed for harmless error as to hearsay, we also cannot conclude that reversal is warranted. While Richardson's testimony may have constituted inadmissible hearsay,[19] we do not hesitate in holding any error harmless, given the overwhelming evidence of Nicholas's guilt — including the testimony of D.N. — and the fact that this testimony represented an extremely small portion of a two-day trial. Moreover, as with the recording device testimony, Nicholas could have — but did not — cross-examine Richardson to ask if she ever personally witnessed Nicholas act in a violent way. *Blyden*, 53 V.I. at 656. Moreover, the Superior Court expressly instructed the jury that it should not consider the "scuffle" testimony as substantive evidence of Nicholas's guilt or innocence. Therefore, to the extent any errors occurred, they do not warrant a new trial.

## 2. Behavior and Personality Testimony

During the trial, several witnesses testified about various aspects of Nicholas's behavior and personality. For instance, witnesses testified that Nicholas had propositioned other women, that "love letters" of his were allegedly found in the apartment after the murder, and described Nicholas as "aloof," "standoffish," and unfriendly. (J.A. 104-05, 166, 143, 284, 286, 567.) In addition to presenting evidence about Nicholas's personality, the People elicited testimony portraying Gottlieb as a good

---

[19] We recognize that the hearsay exception codified in the former section 932(4) of title 5 could potentially apply to both the bruise and recording device testimony. However, the People failed to establish that the statements fall within the exception, in that it is not clear when Gottlieb told Richardson that the bruises were caused by Nicholas.

and generous friend.[20] On appeal, Nicholas contends that this testimony violated the prohibitions on character and reputation evidence codified in the former sections 886 and 887 of title 5, and was otherwise irrelevant to the case.

We agree with Nicholas that none of this testimony was admissible, either under sections 886 and 887(a) or the general prohibition on permitting irrelevant evidence, since none of this information was relevant to any material fact.[21] But again, this Court reviews this issue only for plain error due to Nicholas's failure to lodge contemporaneous objections at trial. As with his hearsay and prior bad acts challenges, Nicholas has failed to establish that any of these errors violated his substantial rights. We simply cannot conclude, given the overwhelming admissible evidence of Nicholas's guilt, that fleeting references to Nicholas being antisocial or pursuing other women could

---

[20] For example, Jones testified that Gottleib was "a good friend, very conscientious, very organized, loving." (J.A. 141.) Richardson stated that Gottlieb was "a very self-giving person. She's the only person that I've ever met like that, that she just loved to give. She lived to give, and always wanted to share whatever she had with somebody else even if it was a stranger that she just met, if they had a need she would give it to them." (J.A. 155.)

[21] The fact that Nicholas may have propositioned other women does not have any "tendency in reason to prove any material fact" in this case. 5 V.I.C. § 771. The evidence was introduced, it appears, only to paint Nicholas in a bad light and to permit the jury to draw negative inferences about his character. Therefore, the evidence should have been excluded. Similarly, the evidence regarding the love letters should also have been excluded because such evidence is irrelevant and, even if relevant, constitutes evidence of specific instances of conduct which are prohibited by section 887.

Other witnesses testified more generally about Nicholas's personality. Jones testified that Nicholas was "standoffish" and Pinney said he was "aloof." (J.A. 143, 567.) Section 886 permits testimony in the form of opinions or reputation evidence only if the evidence is probative of a person's character or trait of character, and so long as the character or trait is in issue. 5 V.I.C. § 886. Nicholas may be an unfriendly person. However, his trait for unfriendliness is not in issue. It was not an element of any of the crimes with which he was charged, and Nicholas never put his character in issue. Therefore, the testimony should have been rejected. See, e.g., United States v. Manfredi, Crim. No. 07-352, 2009 U.S. Dist. LEXIS 104190, at *7 (W.D. Pa. Nov. 9, 2009) (concluding that because the government did not need to prove that the defendants were greedy to succeed on its claim of tax evasion, the defendants' proposed evidence of their generosity was irrelevant and inadmissible); People v. Miller, 890 P.2d 84, 91-96 (Colo. 1995) (deciding that evidence of the defendant's character for truthfulness was properly excluded because it was not relevant to the charge of assault). Similarly, whether or not Gottlieb was a good and generous friend was wholly irrelevant. See United States v. Berrios, Crim. No. 2004/0105, 2008 U.S. Dist. LEXIS 52951, at *37 (D.V.I. July 8, 2008) (noting that the fact that a victim was a "good person" was irrelevant and so statement to that effect was improper).

have in any way influenced the jury's verdict. *See DeSilvia*, 55 V.I. at 873 (deciding that because statements were "brief and isolated", their admission constituted harmless error); *Blyden*, 53 V.I. at 656 (considering whether testimony was important in the context of the whole trial, when analyzing whether its admission was harmless). Likewise, while isolated statements characterizing Gottlieb as a good person may have increased the jury's sympathy for the victim, they would have done so only marginally, and certainly not in any way that could have substantially affected Nicholas's rights. *See People v. Humphrey*, 15 A.D.3d 683, 789 N.Y.S.2d 325, 328 (N.Y. App. Div. 2005) (deciding that wife's statements about victim increased jury's sympathy but were "minimal" and were harmless "in light of the overwhelming evidence of the defendant's guilt"). Therefore, their improper admission did not render Nicholas's trial unfair and does not warrant reversal.[22]

### 3. *Lay Opinion Testimony*

Finally, Nicholas challenges that the fact that six witnesses for the prosecution testified, in one form or another, that Nicholas killed Gottlieb.[23] We agree with Nicholas that this lay opinion testimony was

---

[22] In his appellate brief, Nicholas also argues that the People committed prosecutorial misconduct by, in closing arguments, relying on the testimony describing Nicholas's standoffish personality to contend that Nicholas was "a liar," "cold-hearted," "a coward" and "treacherous and calculating." (J.A. 715.) While we agree that these statements were improper, the prosecutor's remarks are harmless for the same reasons the underlying testimony relating to Nicholas's personality is harmless, in that the references during closing arguments were fleeting and the judge instructed the jury that they "are not to be influenced by any personal likes or dislikes, opinions, prejudices or sympathy" and they "must decide the case solely on the evidence before" them. (J.A. 755.) *See DiSilva*, 2011 WL 4566431, at *7 (finding a similar curative instruction to have sufficiently reduced the risk of prejudice). Moreover, the only other alleged instance of prosecutorial misconduct identified in Nicholas's brief — the prosecutor's statement that Nicholas was financially "desperate" due to the income he lost as a result of the breakup with Gottlieb, to which Nicholas also did not lodge a contemporaneous objection, (J.A. 704-05) — does not actually constitute misconduct, given the evidence in the record that Nicholas used Gottlieb's credit card, drove her vehicle, and used her bank card to withdraw cash, all of which supports an inference that he was financially "desperate."

[23] Joseph testified that, upon arriving at the Gottlieb residence and learning of the murder, she screamed outside "oh God, he killed my aunt, he killed her . . . her boyfriend, she had put him out and I saw him with her last night and that's the last time I saw my aunt alive and it's he who killed her." (J.A. 100). Pinney testified that when she also arrived at the apartment, she started screaming, "oh, my God, Mitch killed her and he took [D.N.] just like I told her, and now we're never going to find [D.N.]." (J.A. 553.) Green testified that upon learning of

unquestionably inadmissible because not a single one of these witnesses had any personal knowledge of who killed Gottlieb — since their testimony clearly established that none of them even saw Gottlieb on the day she died, nor were any of them in the apartment at the time of the murder — and they likewise lacked any "experience, training or education" that could allow them to reach such a conclusion based on their rational perceptions. 5 V.I.C. §§ 833, 911(1). Nicholas, however, also failed to object to any of this opinion testimony at trial, and — as with most of his evidentiary challenges — has raised this issue for the very first time on appeal. Therefore, we again review this issue only for plain error.

 We cannot emphasize strongly enough that the Superior Court committed an egregious error when it permitted this testimony, and in a case where the evidence of guilt is not overwhelming, such an error may well warrant a new trial even under the plain error standard of review. Nevertheless, we simply cannot conclude that Nicholas has met his burden of demonstrating that the error affected the outcome of his trial. *See United States v. Olano*, 507 U.S. 725, 734-35, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993) (indicating that the appellant bears the burden of establishing the elements of plain error); *United States v. Guadalupe*, 402 F.3d 409, 410 n.1 (3d Cir. 2005) (same); *Nanton v. People*, 52 V.I. 466, 491 (V.I. 2009) (Hodge, C.J., concurring in part and dissenting in part) (same). Nicholas does have a right to a trial by jury, which requires that a jury — and not the victim's friends and family — ultimately decides his guilt or innocence. But, although we are highly troubled with the pervasiveness of the admission of such improper testimony, we cannot ignore the fact that the record is replete with credible, persuasive, and overwhelming evidence establishing Nicholas's guilt. Testimony from at least three witnesses placed Nicholas at the scene of the crime around the

---

Gottlieb's death, she screamed, "oh, my God, he killed her, he killed her." (J.A. 200.) When asked who she meant, Green responded, "Mitchell Nicholas. And I said, 'oh, my God, he killed her, he killed her.'" (J.A. 200.) Green then testified that she told Jones "Mitchell killed Georgia, Mitchell killed Georgia, you got to come . . . Mitchell killed Georgia, Mitchell killed Georgia." (J.A. 201). Jones repeated that testimony. He said he got a call from Green and Green was screaming, "'he killed her, he killer her, Paul, he killed her, Georgia is dead.'" (J.A. 147.) When asked who Green meant by "he," Jones testified that "she meant Mitchell Nicholas." (J.A. 147.) Richardson also repeated Green's statements. She testified that Green said, "'he killed her, he killed her, he killed her, he killed her.'" (J.A. 160.) Davis also relayed Green's statement, saying that Green screamed, "Mitch killed Georgia." (J.A. 238.)

time of the murder; his son testified that Nicholas prevented him from getting to his mother after the sound of the gun shot; Nicholas owned a Glock firearm, which according to expert testimony could have been the murder weapon, and when it was found in Nicholas's hotel room, it was missing one round from the magazine, and that bullet was of a kind consistent with the kind of bullet that killed Gottlieb; in the week before the murder, Nicholas had stated that he was angry and that he wanted to burn down the home that he had shared with Gottlieb; Nicholas took Gottlieb's purse from the home and it was found in her car, which Nicholas had driven away from the crime scene; and, finally, there were no signs of a burglary, break-in or struggle at the apartment. Therefore, while the witnesses' exclamations that Nicholas killed Gottlieb were improper, inflammatory and irrelevant, we cannot conclude that the erroneous admission of these statements affected the outcome of the trial and deprived Nicholas of his right to a fair trial.[24] *United States v. Williams*, 444 Fed. Appx. 535, 537 (3d Cir. 2011) (finding that erroneously admitted testimony did not affect the defendant's substantial rights because there was other, "overwhelming" evidence of his guilt).

### E. Second Amendment Challenge

Nicholas, for his last issue on appeal, argues that this Court should reverse his conviction for unlawful possession of a firearm because the statute criminalizing possession, 14 V.I.C. § 2253(a), is unconstitutional. Specifically, Nicholas argues that, for possession to be "authorized by law" pursuant to section 2253(a), one must receive authorization from the Commissioner of the Virgin Islands Police Department pursuant to

---

[24] In his appellate brief, Nicholas references the "cumulative error doctrine," under which an appellate court may order a new trial based on many separate and independent errors that, while individually harmless, rendered a fair trial impossible when aggregated. However, Nicholas references the cumulative error doctrine in only a single sentence in his brief, in which he says that, "[t]aken together, and viewed in the aggregate, the cumulative prejudice of these innumerable errors was absolutely overwhelming," and then proceeds to cite to a single case — *United States v. Parker*, 997 F.2d 219, 222 (6th Cir. 1993) — for the general proposition that the doctrine exists. (Appellant's Br. 50.) Nevertheless, to the extent this fleeting reference to cumulative error is sufficient to properly place the issue before us, we hold that Nicholas's trial was not "the unusual case in which synergistic or repetitive error violates the defendant's constitutional right to a fair trial," given that the evidentiary errors were all fleeting and "the government present[ed] substantial evidence of guilt." *United States v. Delgado*, 672 F.3d 320, 344 (5th Cir. 2012).

section 454(3) of title 23, which requires an applicant for a license to establish "good reason to fear death or great injury to his person or property" or "any other proper reason for carrying a firearm." Relying on *District of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008), Nicholas argues that the fundamental right to keep and bear arms established by the Second Amendment[25] is impermissibly restricted by a statute that grants so much discretion to a government official.

As with most of the issues raised in this appeal, Nicholas never presented his constitutional challenge below, most likely because his trial concluded before *Heller* was decided.[26] While Nicholas concedes that this Court reviews solely for plain error, we note the difficulty in even engaging in this sort of review. Since Nicholas has brought a facial challenge to section 454(3), this Court must consider whether the statute is unconstitutional in all of its applications. *See United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987). But Nicholas never applied for a license to possess a firearm, and — since the issue was never raised — the record is silent with respect to all of the factual issues that would be relevant to considering Nicholas's claim on the merits, such as how the Commissioner exercises his discretion under the statute.

■■ ■■ As *Heller* and its progeny make clear, persons can be "disqualified from the exercise of Second Amendment rights." 554 U.S. at 635.[27] In section 458 of title 23, the Legislature established how one may become disqualified from such rights. The Commissioner could deny a license to, for example, anyone who is mentally incompetent, or a "habitual drunkard," or anyone who has violated a provision of chapter 5

---

[25] The Second Amendment is applicable to the Virgin Islands through § 3 of the Revised Organic Act. *See supra* note 10.

[26] In *Hightree v. People*, we recently declined to address the merits of that appellant's Second Amendment challenge because, in part, he failed to raise it before the Superior Court in the first instance. 55 V.I. 947, 954-55 (V.I. 2011). However, *Hightree* was decided after *Heller*; as Nicholas's trial was held before *Heller* was issued, he had no ability to raise a *Heller* challenge at that time.

[27] Nicholas recognizes — as he must — that the right to own firearms is not unlimited and that many restrictions on that right may be permissible. *Heller*, 554 U.S. at 626-27. For example, the U.S. Supreme Court specifically noted that the *Heller* decision was not meant to "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.*

of title 23 in the past. 23 V.I.C. § 458(a). That is, even if the Commissioner was not permitted to consider an applicant's "need" for a firearm, it is still not clear that Nicholas would have been eligible under section 458(a) to receive a license, since the record contains no evidence that he would be entitled to a license even if the offending portions of section 454(3) were stricken.[28] *See Lowery v. United States*, 3 A.3d 1169, 1173 (D.C. 2010) (refusing to presume that the defendant was an " 'ordinary citizen,' entitled to exercise Second Amendment rights unless disqualifying information affirmatively appears on the record," because to do so would impermissibly shift the "plain error" burden). Since Nicholas has again failed to establish the third prong of the plain error test, we affirm the conviction for use of an unlicensed firearm during the commission of a crime of violence.[29] *Compare Plummer v. United States*, 983 A.2d 323, 342 (D.C. 2009) (remanding for consideration of whether the defendant would have been disqualified from obtaining a license, but in the context of a preserved Second Amendment claim), *with Lowery*, 3 A.3d at 1173 (distinguishing *Plummer* because the *Lowery* defendant had failed to preserve his Second Amendment claim during a pre-*Heller* trial, and declining to remand because the defendant retained burden of showing he would not have been disqualified from obtaining a license).

---

[28] There was evidence produced during the trial that Nicholas had a federal firearms license and a Georgia firearms license, at least at the time that he purchased his firearm. However, that does not establish that he could have obtained a license in this jurisdiction, or that some disqualifying event had not occurred after he obtained those licenses. While section 460 does permit reciprocal recognition of out-of-state licenses, such a provision only applies to "a visitor or transient resident." 23 V.I.C. § 460. The evidence tended to show that Nicholas had been living in the U.S. Virgin Islands for years. Furthermore, Nicholas does not argue on appeal that his out-of-state license should have been sufficient to constitute "authorized" possession under section 2253(a), and therefore has waived the argument.

[29] We recognize that, after oral arguments in this matter, the United States District Court for the District of Maryland declared unconstitutional a Maryland handgun regulation statute that "require[d] an applicant to demonstrate 'good and substantial reason' for the issuance of a handgun permit." *Woollard v. Sheridan*, ___ F. Supp. 2d ___, 2012 U.S. Dist. LEXIS 28498, at *1 (D.Md. Mar. 2, 2012). However, unlike Nicholas, the plaintiff in *Woollard* had applied for — and was granted — a permit in 2003, and then successfully renewed the permit in 2006, but had his renewal request denied in 2009 solely because he failed "to submit evidence 'to support apprehended fear (i.e. — copies of police reports for assaults, threats, harassments, stalking).' " *Id.* 2012 U.S. Dist. LEXIS 28498, at *5.

## III. CONCLUSION

For the foregoing reasons, we affirm Nicholas's convictions for first-degree murder, assault in the first degree, and use of an unlicensed firearm, while we reverse his conviction for unlawful possession of ammunition and vacate the corresponding sentence.