STATE of Minnesota, Respondent,

v.

Trevor Anthony BROWN, Appellant.

No. A06–1038.

Supreme Court of Minnesota.

Oct. 11, 2007.

John Stuart, State Public Defender, Sara Lynne Martin, Asst. State Public Defender, for appellant.

Lori Swanson, Atty. Gen., James Backstrom, Dakota County Atty., Nicole E. Nee, Asst. County Atty., for respondent.

## OPINION

ANDERSON, RUSSELL A., Chief Justice.

In the fall of 1999, appellant Trevor Anthony Brown was convicted and sentenced in Dakota County for the crime of aiding and abetting first-degree felony murder, in violation of Minn.Stat. § 609.185(3) (1998), for the death of Tucker Calvin Wilson. On appeal, we reversed

and remanded for a new trial, enforcing the strict rule prohibiting trial-court entry into the jury room to communicate with a deliberating jury. *Brown v. State*, 682 N.W.2d 162, 168 (Minn.2004). On remand, Brown was again convicted and sentenced for first-degree felony murder. In this appeal, Brown asserts that he was deprived of a fair trial by erroneous and prejudicial evidentiary rulings and by prosecutorial misconduct in cross-examination. We affirm.

On Sunday, December 13, 1998, Wilson's body was found under the Mendota Bridge. Autopsy results indicated that he died of multiple blunt force head and neck injuries. Wilson, approximately 24 years old, grew up in Liberia and arrived in the United States around 1997. He lived with his cousin, Bayogar McCritty, in an apartment in Wayzata. Because McCritty's driver's license had been suspended, Wilson drove McCritty and himself to and from work in McCritty's 1992 Mazda 929. The Mazda 929 had leather seats, a power sunroof, a six-disc CD changer, CDs, and a silver tire gauge kept in the glove compartment.

In the early morning hours of December 14, 1998, investigators found papers at Wilson's apartment with Brown's and Michelle Young's names and phone numbers. Investigators located and spoke with Brown and Young, each age 18 at the time. They denied any knowledge of Wilson's death. At about 9:00 p.m., law enforcement found the Mazda 929 parked in Minneapolis. The Mazda was "unusually clean," with no floor mats, no CD changer, and nothing in the glove compartment. The Mazda was transported to the Bureau of Criminal Apprehension (BCA). Only one latent fingerprint was detected in the Mazda. Young was identified as the source of the print.

Wilson's cell phone was found in a pawnshop in Minneapolis. There was a voice-mail message from Young, left at 9:21 p.m. on December 12, 1998, telling Wilson that "we want to meet you at Conoco." Investigators learned that at around 9:30 p.m. on December 12, Brown, Young, and a third person, Allen Jamal Robinson, were at a Conoco gas station in Apple Valley; that at 10:56 p.m. McCritty spoke with Wilson by cell phone and confirmed that Wilson would pick McCritty up at 12:30 a.m.; and that McCritty had no further contact with Wilson even though McCritty left several voice-mail messages. Investigators also learned that Robinson was staying in an apartment at the Mount Airy complex in St. Paul. They obtained surveillance tape from the Mount Airy complex that recorded Brown, Young, and Robinson entering the complex at 12:52 a.m. on December 13, 1998, and leaving at 1:18 a.m.

Brown was indicted by grand jury for first-degree felony murder and second-degree murder. At trial, both Young and Robinson were called as witnesses for the State.[1] They testified that after Brown and Robinson had been drinking for several hours, Young drove them to a gas station to meet Wilson. They decided that Wilson should drive, so they returned to Young's residence to drop off her car. From there, Wilson drove the group to a church near the Mendota Bridge. They then proceeded down the embankment under the bridge, where young people gathered for drinking parties.

---

1. In return for a statement about his and Brown's involvement in Wilson's death, Robinson was permitted to enter a guilty plea on June 14, 1999, for the lesser offense of aiding and abetting second-degree intentional murder. On April 22, 2002, Young entered a guilty plea to aiding an offender after the fact.

Young testified that at some point, Robinson punched Wilson, who fell to the ground. Brown and Robinson began kicking and throwing rocks at Wilson. When Young tried to leave, Robinson grabbed her and told her to check Wilson's pockets for keys and money. Young said that after Brown rolled Wilson over, he kicked Wilson as Young searched through Wilson's pockets. Young found the keys and money and gave the money to Brown. Young and Robinson then walked up the embankment, and Brown joined them about 15 minutes later. Young drove them in "Calvin's car" to the Mount Airy apartment complex. Young testified that Brown changed his pants, socks, and boots in Robinson's apartment. There was "blood all over his pant leg," and when Young rinsed out Brown's boots, "there was a lot of blood that was coming out." Brown and Young left the apartment and drove "Calvin's car" to Young's residence. Brown cleaned the car and left.

Robinson testified that as they walked down the embankment under the Mendota Bridge, someone pushed him down. After he hit the bottom, he jumped up and punched the closest person, Wilson. He testified that he then climbed up the embankment, and as he was walking away, he heard male voices arguing below and a fight. He said that he did not go back down the embankment and denied making Young go through Wilson's pockets. He said he called for Young to drive him home. Robinson, Young, and Brown returned to the Mount Airy apartment, and after Young and Brown left, Robinson also left, carrying a bag of clothes that he placed in a garbage dumpster.

Other evidence at trial included the testimony of Richard Propps, who was in the Mount Airy apartment when the three arrived and saw blood on Brown's clothes and shoes; the Mount Airy surveillance tape that showed Brown wearing light-colored pants as he entered the complex and dark-colored pants as he left; testimony that a silver tire gauge, burned plastic, and other burned debris were found in a fire pit behind Young's residence; and testimony that sometime during the week after the homicide, Brown bragged about beating and kicking "this guy."

Brown testified on his own behalf, explaining that as the group was driving to the Mendota Bridge, Wilson and Robinson began bickering over Young. He had trouble making it down the embankment and sat down on a ledge because he was intoxicated and feeling ill. He could hear Robinson and Wilson continue bickering and then saw Wilson push Robinson down the embankment. He testified that he heard Robinson and Wilson fighting for "[a] few minutes" and Young "telling them to break it up." Robinson and Young walked back up the embankment, and the three returned to the Mount Airy complex. During the drive, Brown asked about Wilson and Robinson replied, "f* * * Calvin." Brown explained that he changed pants because he had soiled his own earlier in the evening when he vomited due to drinking. He said that he and Young returned to her residence where he passed out on the couch. He said that Young drove him home later that day.

The jury found Brown guilty as charged, and he was committed to the custody of the Commissioner of Corrections for the mandatory life term.

## I.

Brown initially challenges the limitation on cross-examination of a State's witness to show bias through common gang membership and the admission of a digital copy of the analog surveillance tape. He argues that the evidentiary rulings were erroneous and that the individual and cumulative

effects of these errors deprived him of a fair trial.

◼ Generally, "the decision to admit or exclude evidence is committed to the district court's discretion and will not be reversed absent a clear abuse of that discretion." *State v. Harris*, 713 N.W.2d 844, 847 (Minn.2006). We turn to the specific claims.

◼ *Limitation on Inquiry to Show Bias.* On the eighth day of trial, defense counsel gave notice that he intended to cross-examine Propps about his membership in the same gang as Robinson. Concluding that inquiry into the topic of gang membership would be "very prejudicial," the trial court ruled preliminarily to disallow the inquiry, subject to a request for reconsideration upon defense counsel's showing that the inquiry would have the requisite probative value under Minn. R. Evid. 403 (stating that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice").

◼ In criminal cases, the defendant's right to cross-examine witnesses for bias is secured by the Sixth Amendment. *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *id.* at 316–17, 94 S.Ct. 1105 ("We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination."). Nevertheless, trial courts "retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness safety, or

interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

◼ Inquiry on cross-examination into common gang membership may be sufficiently probative to show bias if the attributes of the gang have a direct bearing on the fact of bias and the source and strengths of the witness's bias. *See United States v. Abel*, 469 U.S. 45, 47–49, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984) (holding that evidence showing defense witness's and defendant's membership in secret prison gang sworn to perjury and self-protection was sufficiently probative of defense witness's bias to warrant admission). But common membership in a "loosely knit group having nothing to do with the subject matter of the litigation" may offer little, if any, inference of bias. *Id.* at 54, 105 S.Ct. 465. Further, for gang membership evidence to be admissible to show bias, the proponent of the evidence must establish a foundation showing common membership. *United States v. Keys*, 899 F.2d 983, 986 (10th Cir.1990). Here, defense counsel laid no foundation of common gang membership, either by extrinsic evidence or by offer of proof; moreover, membership in a gang, by itself, does not necessarily have a direct bearing on the fact of bias or the source and strengths of the witness's bias. We therefore conclude that the limitation on cross-examination of the State's witness neither abridged Brown's Sixth Amendment rights nor constituted an abuse of discretion.[2]

◼ *Admission of Digital Copy of Surveillance Videotape.* The original Mount Airy complex surveillance videotape was

---

**2.** To the extent that laying foundation of common gang membership might imperil the confidentiality of the lawyer-client relationship, as defense counsel indicated in this case, de-

fense counsel could request, with notice to the adverse party, permission for a showing in camera.

admitted as evidence at Brown's first trial in 1999 and had been retained since that time. Mount Airy used a time-lapse surveillance system that, in essence, compressed 48 hours of surveillance onto a 2-hour VHS tape. A time-lapse VCR would slow the tape down so that the frames could be seen, slowed down, and stopped frame by frame.

At Brown's first trial, a slowed-down copy of the original tape was played in the courtroom. In this trial, the State was unable to locate a time-lapse VCR to play the original, and on February 21, 2006, the tenth day of trial, the State moved for the release of the tape so that a "real time" copy could be made. By order the same date, the court granted the motion. The tape was then delivered to the BCA where the relevant content was digitized and copied to another VHS tape. Copies were given to defense counsel and the trial court the following day.

After viewing the digital copy, defense counsel objected to the admission of "this new evidence this late in the game," explaining that at the time the State sought the release of the original tape, he understood that the purpose was simply to "slow it down" so that the jury could better view the images. He raised concerns as to the accuracy and reliability of the digital copy. In the alternative, defense counsel requested a 2-day delay to retain an independent expert. The court ruled that the digital copy was admissible, subject to foundation and an explanation of how the copy was produced and/or how the original was altered, and allowed defense counsel until Monday, February 27, to contact an expert.

Prior to admission of the tape, the resident caretaker of the Mount Airy complex testified about the building's surveillance system. The State then established the chain of possession of the original surveillance tape from the caretaker to the BCA agent, Janet Nelson, who produced the digital copy for this trial. Nelson, a 25-year certified police officer with expertise in forensic video, testified about her video and software training. She explained that the system used for video processing in this case was used by various government and business entities, including the FBI, ATF, CIA, IRS, and Target Corporation.

Nelson testified that when she received the original videotape, the first thing she did was to just look at it to make sure that it was not damaged and that the record tab had been removed. After winding the tape to the beginning, she checked the timecode to find the areas identified as relevant to this case. She then digitized the relevant content from the original into her computer system. She explained that when she played the tape in the VCR connected to her computer, the signal ran through an analog-to-digital converter, changing the analog signal, without altering its essential content, into a digital signal. The record indicates that Nelson put on a short demonstration of the digitizing process for the jury. She further explained that the software she used allowed her to adjust the brightness and contrast as the video came into the computer, but she did not do that here because the original "was a very good tape." She "brought it in as it was recorded," meaning "that it was brought in at the default instead of my adjusting it manually."

Nelson testified that the digitized content was then copied to the VHS tape that was played for the jury, in three segments: at the speed the content was captured from the original tape, at 15 percent of the original speed, and then at 5 percent of the original speed. Nelson also made some still prints from the digitized video using Photoshop to adjust the contrast and brightness. Defense counsel offered two still prints during cross-examination of

Nelson. On redirect, two other still prints were admitted without objection. At the conclusion of both the State's and Brown's evidence, defense counsel advised that they had determined an independent expert was not needed.

Brown's appellate counsel asserts reversible error in the admission of the digital copy of the original tape in the absence of a *Frye/Mack*[3] hearing. We are aware of no authority, and counsel cites none, for the proposition that the conversion process in which an analog signal is changed, without altering its content, into a digital signal implicates concerns related to novel scientific evidence. Digital copies may qualify as duplicates of the original. 2 *McCormick on Evidence* § 236, at 100 (Kenneth S. Broun ed., 6th ed.2006). As with other pieces of evidence, the proponent of a digital copy of analog video must lay proper foundation.

A duplicate recording "is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." Minn. R. Evid. 1003. The term "duplicate" includes mechanical or electronic re-recordings. Minn. R. Evid. 1001(4).[4] "Re-recordings of audio tapes or videotapes should be accepted as duplicates when shown to have been made by a technique designed to ensure accurate reproduction of the original." 6 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 1001.09[8][a] (Joseph M. McLaughlin ed., 2d ed.2007). Composite tapes made from re-recordings of originals may be received as duplicates. 5 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 10:15, at 717 (3d ed.2007).[5]

█ Unless there is a genuine question as to the authenticity of the original recording or unfairness in the admission of the digital copy that qualifies as a duplicate, the properly authenticated digital copy is generally admissible. *E.g., United States v. Savarese*, 404 F.3d 651, 656 (2d Cir.2005) (concluding that digital copy of recording qualified as duplicate); *United States v. Stewart*, 420 F.3d 1007, 1021 n. 13 (9th Cir.2005) (concluding there was no error in the admission of a disk made from a digital recording device). Here, the tes-

**3.** *See State v. Mack*, 292 N.W.2d 764, 768 (Minn.1980).

**4.** Minn. R. Evid. 1001 provides:

> For purposes of this article the following definitions are applicable:
> (1) Writings and recordings. "Writings" and "recordings" consist of letters, words, or numbers, or their equivalent, set down by handwriting, typewriting, printing, photostating, photographing, magnetic impulse, mechanical or electronic recording, or other form of data compilation.
> (2) Photographs. "Photographs" include still photographs, X-ray films, video tapes, and motion pictures.
> (3) Original. An "original" of a writing or recording is the writing or recording itself or any counterpart intended to have the same effect by a person executing or issuing it. An "original" of a photograph includes the negative or any print therefrom. If data are stored in a computer or similar device, any printout or other output readable by sight, shown to reflect the data accurately, is an "original".
> (4) Duplicate. A "duplicate" is a counterpart produced by the same impression as the original, or from the same matrix, or by means of photography, including enlargements and miniatures, or by mechanical or electronic rerecording, or by chemical reproduction, or by other equivalent techniques which accurately reproduces the original.

**5.** The admission of a composite tape would be "subject to the limits in" Minn. R. Evid. 1003, and because a "composite tape amounts to a 'summary' under" Minn. R. Evid. 1006, "the other side should have access to uncut originals." Mueller & Kirkpatrick, *supra*, § 10:15, at 717.

timonial record was sufficient to support admission of the digital re-recording as a duplicate.[6]

Despite the requirement that the duplicate be produced by a technique designed to accurately reproduce the original, we understand that there is the risk of manipulation or distortion, particularly with digitization, and "commentators have properly urged courts to exercise greater care * * * for photographic evidence * * *." Mueller & Kirkpatrick, *supra*, § 9:23, at 509. In addition, "[t]he danger of fraudulent and inaccurate editing of the tapes can be minimized by giving the other side notice, or by having the court arrange for supervision of the editing." Weinstein, *supra*, § 1001.09[8][a]. "The trial judge has broad discretion to make a finding of unfairness." *Id.* § 1003.04[1].

The record in this case reflects that the State's notice and motion seeking to make a "real time" copy of the original videotape, made 10 days into trial, was wholly inadequate to convey to defense counsel and the trial court that the State contemplated reproduction by digitization. Nevertheless, we conclude that the admission of the digital copy was not an abuse of the trial court's discretion under the circumstances in this case. But prosecutors should be on notice that the trial court has broad discretion to exclude digital copies if defense counsel is not provided with adequate notice and opportunity either to observe the conversion process or retain an independent expert to make a similar conversion or, in the alternative, to allow the court to arrange for supervision of the process.

## II.

■ Brown also asserts serious prosecutorial misconduct warranting a new trial.

Apparently because of the difficulty in connecting bloody footprints found at the crime scene with footwear found during the criminal investigation, there was an understanding that shoes and footprints would not be placed in issue. In cross-examining Brown, however, the prosecutor attempted to connect the crime-scene footprints to boots allegedly purchased by Brown. The trial court sustained defense counsel's objection, ordered that the questions and answers regarding boots be stricken, and instructed the jury to disregard that inquiry. The court, in its final instructions, told the jurors: "You are to disregard all evidence I have ordered stricken or have told you to disregard."

■ "It is improper for a prosecutor to ask questions that are calculated to elicit or insinuate an inadmissible and highly prejudicial answer." *State v. Henderson*, 620 N.W.2d 688, 702 (Minn. 2001). "Any time a prosecutor desires to make an inquiry of doubtful propriety, the prosecutor should seek permission from the trial court in chambers before asking the question." *State v. McRae*, 494 N.W.2d 252, 259 (Minn.1992). Prosecutorial error, however, may be cured by court instructions unless the error imparts substantial prejudice into the case. *State v. Pendleton*, 706 N.W.2d 500, 509 (Minn. 2005). While the questions here were improper, the court's ruling and instructions adequately addressed the matter.

Affirmed.

## CONCURRENCE

MEYER, Justice (concurring).

I write separately to note my disagreement with the majority's conclusion that

---

**6.** Brown's appellate counsel used the terms "manipulated" and "altered" in referring to the digital copy played for the jury, but the evidence at trial was that there was neither manipulation nor alteration in the analog-to-digital conversion of the original.

the limitation on cross-examination of Propps did not abridge Brown's Confrontation Clause rights. I would conclude that the district court erred when it permitted Brown on cross-examination to only establish that Propps grew up in the same neighborhood with Robinson, had a longstanding relationship with Robinson, and frequently socialized with Robinson. Evidence that Propps and Robinson were members of the same gang was important to establish Propps's bias in favor of Robinson and against Brown. Brown was prevented from fully exploring Propps's bias in favor of Robinson and, therefore, his right to confront the witnesses against him was violated. Nevertheless, I would conclude that the refusal to allow cross-examination on gang membership was harmless error, and, therefore, I concur in the result.

The Confrontation Clause guarantees criminal defendants the right to be confronted with the witnesses against them. U.S. Const. amend. VI. "The main and essential purpose of confrontation is to secure * * * the opportunity of cross-examination." *Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (quotation marks omitted) (emphasis omitted). Exposure of a witness's bias or motivation in testifying is an important function of the right to cross-examination. *Id.* at 316–17, 94 S.Ct. 1105. It is error to prohibit a criminal defendant from conducting cross-examination "designed to expose a prosecution witness' bias or motivation in testifying." *State v. Pride,* 528 N.W.2d 862, 866 (Minn.1995) (citing *Delaware v. Van Arsdall,* 475 U.S. 673, 677–78, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)).

The U.S. Supreme Court has said that "[a] witness' and a party's common membership in an organization, even without proof that the witness or party has personally adopted its tenets, is certainly proba-

tive of bias." *United States v. Abel,* 469 U.S. 45, 52, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984). The Court found that evidence of common membership in a prison gang had probative value outweighing the risk of undue prejudice and held that there was no abuse of discretion in admitting the testimony. *Id.* at 54–55, 105 S.Ct. 465. The Court recognized that the evidence would be prejudicial, but noted that the witness being impeached would suffer "no sanction other than that he might be disbelieved." *Id.* at 53, 105 S.Ct. 465.

Although the victim's death in this case did not appear to have been gang-related, Propps's gang membership in common with Robinson, an admitted participant in the events leading to the victim's death, was potentially probative of Propps's bias in favor of Robinson and against Brown. The *Abel* Court noted that evidence of membership in an "organization," without information about the type of organization, would not bear on the source and strength of the bias, and would thus not be a satisfactory substitute. 469 U.S. at 54, 105 S.Ct. 465. Similarly, evidence that Propps and Robinson grew up in the same neighborhood, sometimes stayed in the same apartment, and socialized frequently, without calling one another "friend," might not convey the strength of bias that can exist among co-members of a gang.

Any potential prejudice from allowing the defense to question Propps about his gang affiliation was to Propps and Robinson. Robinson had already pleaded guilty and been sentenced; Propps was not on trial. As in *Abel,* the only real risk to either was that his testimony might be disbelieved. The risk to the court was that the trial might take longer. These risks of prejudice do not rise to the level of overwhelming the potential probative value of information about Propps's and Robinson's common gang membership, especial-

ly in light of the constitutional guarantee of a criminal defendant's confrontation rights. I would hold that the district court erred in limiting Brown's cross-examination of Propps.

Violations of the Confrontation Clause are subject to harmless error analysis. *State v. Wright,* 726 N.W.2d 464, 476 (Minn.2007). A new trial is not warranted when the error is harmless beyond a reasonable doubt. *Id.* A Confrontation Clause error is harmless beyond a reasonable doubt if "the guilty verdict actually rendered was 'surely unattributable' to the error." *Id.* If there is a reasonable possibility that the verdict would have been different if the evidence had been admitted, then the error is not harmless. *State v. Quick,* 659 N.W.2d 701, 716 (Minn.2003).

Here, even without evidence of common gang membership, Propps's testimony did suggest that he had a bias toward Robinson and might be changing his story to benefit Robinson. Propps admitted that he hardly knew Brown, but that he and Robinson often stayed in the same apartment and socialized frequently. Propps recognized that Robinson was an "associate" (not liking to use the word "friend" because he does not believe in friends), whereas Brown was not.

Propps's credibility was impeached in other ways as well. Propps admitted that he was intoxicated on the evening in question. Propps also admitted he had originally told police that Robinson had blood on his clothing. While Propps offered testimony that he had heard Brown say "they had to handle their business with that mother f* * *er," cross-examination revealed that when he spoke to the police less than a week after the murder, he may have told them that Robinson made the statement. In other words, the jury heard about Propps's conflicting versions of what he saw on the night of the murder.

The jury does not appear to have been convinced by Propps's efforts to exonerate Robinson. It found Brown guilty of aiding and abetting Robinson in the murder. Given that the district court admitted ample evidence of Propps's lack of credibility and that the jury clearly believed Robinson was involved in the murder, the error was harmless beyond a reasonable doubt.

I would hold that the district court erred in denying Brown the opportunity to cross-examine Propps about his gang membership, but because the error was harmless, I agree with the majority's conclusion that Brown's conviction should be upheld.

ANDERSON, PAUL H., Justice (concurring).

I join in the concurrence of Justice Meyer.

HANSON, Justice (concurring).

I join in the concurrence of Justice Meyer.