**NESTA JAMES, Appellant/Defendant**

**v.**

**PEOPLE OF THE VIRGIN ISLANDS, Appellee/Plaintiff**

S. Ct. Criminal No. 2011-0052

Supreme Court of the Virgin Islands

December 12, 2013

312

313

VANESSA-NOLA PRATT, ESQ., The V-Law Group, PLLC, Washington, D.C., *Attorney for Appellant.*

PAMELA R. TEPPER, ESQ., Department of Justice, St. Thomas, USVI, *Attorney for Appellee.*

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and SWAN, *Associate Justice.*

## OPINION OF THE COURT

(December 12, 2013)

SWAN, *Associate Justice.* Appellant, Nesta James, was charged in a four-count Information with the shooting and injuring of another during an altercation that involved a $10 debt. James challenges his convictions alleging various evidentiary errors and the insufficiency of the evidence used to convict him. Finding sufficient evidence from which a reasonable jury could properly convict on all the charges, and finding no reversible error, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

On July 15, 2009, around noontime, Lennox LeBlanc was on Kronsprindsens Gade in Charlotte Amalie, St. Thomas walking toward the local Department of Labor to deliver a test he had completed. (J.A. at 91.) After delivering the test, he proceeded eastward towards the St. Peter and Paul Catholic School. LeBlanc was approaching the Wok D'Lite Restaurant when he heard someone yell at him. The person was Nesta James. Subsequently, James entered the restaurant after LeBlanc and immediately demanded of LeBlanc that he pay the $10 which James claimed LeBlanc owed him. LeBlanc informed James that he did not have the money. A verbal altercation ensued between them. During the altercation, Keith Mercer was in the restaurant having lunch. Mercer overheard James state that "it's the principle about it. When you had need [sic] the money you come look for me and now it's time to pay me back." (J.A. at 127.) James intimated to LeBlanc that he had a gun, to which LeBlanc replied that he had a knife and briefly displayed the knife to James. James threatened that if LeBlanc displayed the knife again, he would shoot LeBlanc. (*Id.* at 129.)

In an effort to discourage James, LeBlanc departed the restaurant. However, James followed him and their argument continued. LeBlanc

reentered the restaurant and James again followed. At that time, James stepped behind a wall and readied his gun by cocking it. James immediately approached LeBlanc and truculently placed his finger in proximity to LeBlanc's face, to which LeBlanc responded by punching James. (J.A. at 94.) A fracas immediately ensued during which James shot LeBlanc in his face. (*Id.*) After James shot LeBlanc, Mercer saw James hastily flee the restaurant and run eastward towards the Market Square area. (*Id.* at 128.) LeBlanc was transported to the Roy Lester Schneider Hospital where he was a patient for approximately four days while being treated for the gunshot wound in his face. (*Id.* at 168-70.)

Later, on the day of the shooting, Detective Allen Lans went to Club 75, a gentlemen's night club located on the second floor of the building and above Wok D'Lite, in order to access the Club's security camera footage. Club 75 had several security cameras in the area, including one on a telephone pole directly across the street from Club 75 and Wok D'Lite. (J.A. at 205.) From Club 75's security system and with the assistance and instruction of Club 75's system technician, Detective Lans copied the surveillance footage of the area immediately outside of Wok D'Lite. Detective Lans then took the recorded footage to the police station and made copies for viewing by other officers and detectives assigned to the case. (*Id.* at 167.) The People would later use this video in its case against James.

James was arrested and charged in a four-count Information with the following: Count I, attempted murder in the first degree in violation of 14 V.I.C. §§ 921, 922(a)(1) and 14 V.I.C. § 331; Count II, unauthorized use of a firearm during the commission of attempted murder in violation of 14 V.I.C. § 2253(a); Count III, third degree assault in violation of 14 V.I.C. § 297(2); and Count IV, unauthorized use of a firearm during the commission of a third degree assault in violation of 14 V.I.C. § 2253(a). (J.A. at 23-24.)

During trial preparation, defense counsel requested the opportunity to view the surveillance camera footage but was unable to do so because of technical difficulties. (J.A. at 33.) As a result, the defense filed a "Motion to Compel Inspection of Surveillance Tape and Other Discovery Requests" on August 25, 2010 ("Motion to Compel"), and a Motion to Suppress dated September 24, 2010. (*Id* at 31-35.) The trial court denied both motions. (*Id.* at 27-29.)

During a preliminary hearing, the Defense objected to the use of the surveillance tape because a live solitaire card game was actively being played while superimposed in the middle of the tape. Therefore, the Defense orally renewed its Motion to Suppress the surveillance tape. However, the trial court was unable to rule on the motion because it never viewed the surveillance videotape since the trial court's electronic system was incompatible with the disk. (J.A. at 64.)

During trial, numerous witnesses, including LeBlanc, Mercer, and Detective Lans, testified for the People. At a sidebar conference immediately before the examination of Detective Lans, the Defense again objected to the videotape's admission. Nonetheless, the trial court permitted the videotape to be viewed by the jury after its admission into evidence. (J.A. at 154.) Thereafter, the Prosecution called Detective Lans and questioned him concerning the retrieval and copying of the surveillance camera footage. (*Id.* at 201.) At another side bar conference during the examination of Detective Lans, the trial court and counsel for both parties continued to discuss the admission of the videotape. The People expressed its wish to show only a portion of the tape, which did not include the superimposed card game. (*Id.* at 217-19.) However, the Defense was given the option to have the entire videotape viewed by the jury, including the portions of the videotape with the superimposed card game. (*Id.*) The defense declined this option. Accordingly, approximately 10 minutes of the 40 minute surveillance tape video was viewed by the jury, which excluded a portion of the video with the superimposed card game. LeBlanc narrated the video as it was being played for the jury.

Subsequently, the jury found James guilty of all counts in the Information. He was sentenced to 20 years imprisonment on Count I, attempted murder in the first degree and 20 years imprisonment on Count II, unauthorized possession of a firearm during the commission or attempted commission of a crime of violence. (J.A. at 20.) Both sentences were ordered to be served concurrently with each other, and with a sentence imposed from a previous unrelated criminal conviction. (*Id.*) For sentencing purposes, the trial court further ordered that Count III merged with Count I and that Count IV merged with Count II, and that no separate

sentence would be imposed for Counts II and IV.[1] (*Id.* at 21.) This timely appeal ensued.

## II. JURISDICTION

Title 4, section 32(a) of the Virgin Islands Code provides, in pertinent part, that "[t]he Supreme Court shall have jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as otherwise provided by law." A Judgment and Commitment dated July 29, 2011 was entered in this case, which ended the prosecution of James in the trial court, and this timely appeal followed. Accordingly, we have jurisdiction over this appeal.

## III. ISSUES AND STANDARD OF REVIEW

On appeal, James challenges the admissibility of the videotape surveillance footage because of the superimposed card game that inexplicably appeared in the middle segment of the videotape. James also asserts that the evidence elicited at trial was insufficient to convict him of the crimes.

We review a trial court's decision to admit evidence under the standard of abuse of discretion. *Billu v. People*, 57 V.I. 455, 461 (V.I. 2011); *Corriette v. Morales*, 50 V.I. 202, 205 (V.I. 2008); *United States v. Goldin*, 311 F.3d 191, 197 (3d Cir. 2002). Regarding a trial court's decision on a motion to suppress, we review its factual findings for clear error and exercise plenary review over its legal determinations. *Blyden v. People*, 53 V.I. 637, 646-47 (V.I. 2010). In reviewing a claim of insufficiency of the evidence, we apply a "particularly deferential standard of review."

---

[1] The People expressed concern at oral argument before this Court that this sentence might run afoul of 14 V.I.C. § 104 in accordance with our holding in *Castor v. People*, 57 V.I. 482 (2012). However, we distinctly held in *Castor* that while a defendant may be charged and convicted of violating multiple provisions of the Virgin Islands Code, he may only be punished for one offense arising out of each discrete act or indivisible conduct. *Id.* at 497-97. *See generally Williams v. People*, 56 V.I. 821, 832-34 & n.9 (V.I. 2012). Here, although the attempted first degree murder charge and the assault charge arose out of the same shooting act, the trial court in effect followed the section 104 procedure by (1) stating what sentence it would impose for each discrete conviction, and (2) by announcing that the assault charge merged into the attempted murder charge, effectively staying execution of any punishment on the assault charge. Accordingly, the Superior Court did not violate any of James' substantial rights when it imposed a sentence that, as a practical matter, conforms to section 104 and our prior decisions.

*Castor v. People*, 57 V.I. 482, 488 (V.I. 2012); *Stevens v. People*, 52 V.I. 294, 304 (V.I. 2009); *Smith v. People*, 51 V.I. 396, 398 (V.I. 2009). *Accord United States v. Bansal*, 663 F.3d 634, 665 (3d Cir. 2011). An appellant has a very heavy burden in advancing an insufficiency of the evidence claim. *Latalladi v. People*, 51 V.I. 137, 145 (V.I. 2009). We must affirm a jury's verdict as long as substantial evidence was presented at trial to allow a rational trier of fact to convict when the evidence is viewed in a light most favorable to the People. *Todmann v. People*, 59 V.I. 926, 934 (V.I. 2012); *United States v. Wright*, 665 F.3d 560, 567 (3d Cir. 2012) and *Stevens v. People*, 52 V.I. 294, 304 (V.I. 2009). Therefore, a finding of insufficiency of the evidence should be confined to those cases in which the prosecution's failure to establish the elements of the crime is clear. *Todmann*, 59 V.I. at 934; *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002).

## IV. DISCUSSION

### A. The admission of the videotape was not an abuse of discretion

James asserts a number of errors in the trial court's admission in evidence of the videotape security surveillance footage with a card game superimposed in the middle segment of the videotape. Specifically, James asserts that defense counsel was precluded from reviewing the videotape footage which constituted a violation of Rule 16 of the Federal Rules of Criminal Procedure. James further asserts that the video which was submitted at trial was different from the video that previously was partially reviewed by counsel. James avers that there are chain of custody issues surrounding the videotape particularly regarding its authenticity. Finally, James asserts that the trial court was unable to make a sufficient ruling on the discrepancies on the surveillance videotape because of technical difficulties. We reject these claims as non-meritorious. The record on appeal does not reflect the facts as portrayed by James. A brief chronology of the events surrounding the admission of the videotape during trial is necessary to clarify certain facts that were misstated by James.

### *The record does not establish a violation of Fed. R. Crim. P. 16*

On August 25, 2010, James filed the Motion to Compel alleging that the People failed to produce the surveillance video for inspection after the

first inspection attempt failed because of a technical error in viewing the video. On September 24, 2010, James also filed a Motion to Suppress, requesting that any video surveillance footage depicting James' conduct near the Wok D'Lite Restaurant be suppressed. The trial court issued an October 27, 2010 Order denying both motions without prejudice. In the Order, the trial court concluded that the People had never refused James' requests or denied him access to the videotape, and that the People had repeatedly expressed their willingness to make disclosure of the evidence sought by James upon an agreement between the parties regarding a time scheduling for disclosure. Because prior to trial James had ample opportunity to review the videotape surveillance footage admitted in evidence and shown to the jury, his claim of a Rule 16 violation is meritless.

Rule 16 of the Federal Rules of Criminal Procedure mandates that the People, upon request from the defense, permit inspection of evidence, such as the videotape surveillance footage, that they intend to use at trial. *See* FED. R. CRIM. P. 16(a)(1)(E)(i)-(ii) and SUPER. CT. R. 7 (making Federal Rules of Criminal Procedure applicable in Superior Court proceedings). The trial record does not confirm that the People refused defense counsel access to the videotape surveillance footage. It would appear, contrary to James's assertion on appeal, that defense counsel was able to preview the videotapes at some time after the Order denying the motions and before commencement of trial on April 11, 2011. Importantly, defense counsel, who was not appellate counsel, was able to review, prior to the trial, the version of the videotape played at trial.

█ At a preliminary hearing, immediately before the trial, defense counsel orally renewed the defense's Motion to Suppress, challenging the authenticity of the surveillance video because a card game had been superimposed on the video footage. (J.A. at 47.) The tape that had the video card game superimposed on it was the same video that was played for the jury. Commonsensically, if defense counsel had never been allowed to view the surveillance video prior to the trial and had seen the video for the first time at trial, as James asserts on appeal, defense counsel would not have been able, at trial and well before its admission in evidence, to move to suppress the video footage based upon the superimposed card game on the videotape. Accordingly, we find that no Rule 16 violation occurred because defense counsel must have had an opportunity to view the videotape footage before trial in order to have

renewed his first Motion to Suppress during trial based upon the superimposed card game in the video.

### *The trial court did not abuse its discretion in admitting the videotape surveillance footage*

Many aspects of James' claims referencing the trial court's decision to admit the videotape surveillance footage are misleading. For instance, James claims that the trial court made a ruling on the suppression of the videotape surveillance footage, although James was unable to view the tape due to technical difficulty. The following statement was made by the trial court at the preliminary hearing immediately prior to the commencement of trial:

> I have reviewed this disk which says Wok D'Lite 10-7109B11872. There is nothing that I see regarding a card game on that disk, and it appears to be merely video surveillance of street scenes. The other disk which says *People of the Virgin Islands appeal VI versus Nesta James, Wok D'lite*, is not compatible with my system, so I'm unable to review that. And so therefore I cannot make a ruling on it at this point. It will be reviewed at a break or over the lunch hour, but counsel should make no reference to it in their opening statements until I've had an opportunity to review it.

J.A. at 64 (emphasis in original). Unlike James' version of the facts, the trial court did not rule on the Motion to Suppress without reviewing the videotape that was used at trial. Additionally, the record reflects that the trial court viewed the videotape surveillance footage in the presence of the parties' counsel prior to making a ruling on the motion to suppress. (J.A. at 142-45.) The trial court discussed several times during the trial, in side-bar conferences, the content of the videotape surveillance footage before the trial court finally allowed the footage to be presented to the jury. (*Id.* at 142-45 and 149-54.) The People expressed their desire to show only the first five minutes and the last seven minutes of the forty minute videotape recording. (J.A. at 215.) These sections of the videotape did not reveal the offending card game. The segment of the video with the superimposed card game was somewhere in the middle of the video footage at the 17 minute mark. The record further discloses that, prior to making a ruling, the trial court considered the defense's objections to the videotape containing the card game. Consequently, James' argument that prior to ruling the trial court did not

view the videotape surveillance footage shown at trial, must fail as a misrepresentation of the facts.

■ Moreover, we conclude that the videotape surveillance footage was properly authenticated prior to its admission in evidence. An item of evidence is properly authenticated once the proponent sufficiently demonstrates that the item is what the proponent claims it to be. *See* FED R. EVID. 901(a).[2] Testimony from a witness with knowledge that an item is what it purports to be as well as evidence describing the process used to produce the item satisfies the requirement for authentication. *See* FED R. EVID. 901(b)(1) & (7). Numerous jurisdictions have acknowledged that the facts and circumstances surrounding the admissibility of a recording can be different in each case, and thus the background information required for authentication of a video recording can vary with the circumstances. *See United States v. Starks*, 515 F.2d 112, 121 (3d Cir. 1975) (audio recording). *See also United States v. Capers*, 708 F.3d 1286, 1302-07 (11th Cir. 2013) (video and audio recordings); *United States v. Rosado-Perez*, 605 F.3d 48, 55-56 (1st Cir. 2010) (video and audio recordings); *United States v. Oslund*, 453 F.3d 1048, 1054 (8th Cir. 2006) (audio recordings); *United States. v. Branch*, 970 F.2d 1368, 1371-72 (4th Cir. 1992) (audio recordings); and *Videotape Evidence*, 44 AM. JUR. TRIALS 171, § 4 (2012).

■ The plurality of jurisdictions agree that a video recording may be authenticated by testimony from the operator, recorder, installer, or maintainer of the equipment that the videotape is an accurate representation of the subject matter depicted. 32A C.J.S. *Evidence* § 1258 (collecting cases). In general, a party may provide proper foundation for the admission of a videotape by providing 1) testimony demonstrating that the videotape fairly and accurately illustrates the events filmed; 2) testimony regarding the checking, operation, and handling of the recording equipment; 3) testimony that the videotape admitted at trial is the same as the one the witness inspected previously, or 4) testimony that the videotape has not been edited and fairly and accurately recorded the

---

[2] The local codification of the 1953 Uniform Rules of Evidence found at 5 V.I.C. §§ 771-956 required only that writings, and not non-writings, be authenticated prior to being admitted at trial. However, 5 V.I.C. §§ 771-956 was repealed in 2010. The trial in this case commenced on April 11, 2011, well after the date that the URE were repealed. (J.A. 18.) See Act No. 7161, § 15 (V.I. Reg. Sess. 2010) (adopting Federal Rules of Evidence, effective upon the Governor's signature April 7, 2010).

actual appearance of the area and events that transpired. *State v. Collins*, 216 N.C. App. 249, 716 S.E.2d 255, 258 (2011).

At trial, Detective Lans was thoroughly examined about the procedure used to copy the video footage from the surveillance camera. Detective Lans testified about his education and certifications in digital media retrieval and about his eight years of experience in retrieving digital media, such as video surveillance. (J.A. at 202.) Additionally, Detective Lans gave a detailed overview of the methods used to retrieve the video surveillance footage of the shooting from Club 75's computer system. (*Id.* at 207.) He further testified about the speed in which the playback was made and that the recording was made during the reported times in which the incident occurred. (*Id.* at 207-10.) Importantly, Detective Lans was able to review the copy of the video marked as People's Exhibit 11, and affirmed that the tape is the same tape that was retrieved from Club 75's surveillance system. (J.A. at 220.) He also identified and confirmed that the handwriting on the DVD that was admitted in evidence was his identification handwriting. (*Id.* at 209.)

After Detective Lans's testimony, the video surveillance footage was played for the jury while LeBlanc, a person with firsthand knowledge of the events in the video footage and a person depicted in the video footage, narrated it for the jury's edification. LeBlanc identified for the jury both himself and James and gave the jury an account of what was transpiring on the video. While the better practice would have been to also have LeBlanc directly testify that the video surveillance footage accurately represents the events as they occurred on that day and at the time, the court was within its discretion to regard the testimony of both Detective Lans and LeBlanc as sufficient evidence to support the video's evidentiary foundation and to authenticate the video.

The videotape in this case was properly authenticated under circumstances, similar to those considered in the decisions of numerous other courts, that have concluded videotape evidence was properly authenticated. For instance, Minnesota's Supreme Court concluded that the testimony of a police agent regarding her video and software training, her certification, the video recording process, and the cause of a videotape's time-lapse was sufficient for admission of a videotape challenged by the defense because the video showed the defendant entering a building with light-colored pants and departing with dark-colored pants. *State v. Brown*, 739 N.W.2d 716, 719-23 (Minn. 2007). One

appellate court held that the trial court's admission of a videotape was not abuse of discretion where the prosecution laid proper foundation through a police officer's testimony regarding the nature of the recording device, that he personally prepared and recorded the video, and that the video admitted was consistent with what he knew had occurred and that he had no reason to suspect the video had been altered or tampered with. *Mays v. State*, 907 N.E.2d 128, 131-32 (Ind. Ct. App. 2009). In another similar case, the Illinois Supreme Court reversed a lower appellate court and held that videotape surveillance footage was properly admitted into evidence, despite an inexplicable 30-second skip in the tape. *People v. Taylor*, 2011 IL 110067, 956 N.E.2d 431, 437-40, 353 Ill. Dec. 569 (2011) (upholding the admission of the recording where the detective who assembled the videotape equipment and recorded the fracas depicted on it testified regarding the functionality of the camera and the method used in recording, and that the videotape that was reviewed by the trial judge was the same tape that the detective recorded).

█ █ In the present case, during his narration of the videotape, LeBlanc never indicated that something on the tape was incorrect or different from what he remembered regarding what was depicted on the videotape. Further, there was no indication or evidence that the People actively sought to provide an inaccurate version of the videotape surveillance footage. *See United States v. Reed*, 887 F.2d 1398, 1405 (11th Cir. 1989) (holding that a trial court has broad discretion in admitting recorded media into evidence as long as there is independent evidence of accuracy). Moreover, technical difficulties resulting in poor quality, distortion, incomplete vision, or some other error are not sufficient to require automatic exclusion of videotape evidence especially when weighed against the evidence's probative value. *Videotape Evidence*, 44 AM. JUR. TRIALS 171, § 67 (2012) (collecting cases) and *Foundation for Contemporaneous Videotape Evidence*, 16 AM. JUR. PROOF OF FACTS 3D 493, § 27 (2012) (collecting cases). The court may use its discretion in determining whether a videotape's technical difficulties are of such a nature as to render the recording useless to the jury. *Id.*

█ Similar to the above cases, the card game's imposition on the videotape in this case was an artifact that is more consistent with a spontaneous technical difficulty and is not indicative of tampering or nefarious editing of the videotape. The card game did not appear to have obfuscated the videotape to any extent that the jury would not have been

able to discern what was occurring as depicted on the videotape. Defense counsel had the option of playing the entire videotape and having the jury evaluate the evidence despite the card game's imposition on the videotape but chose not to do so. Because the testimony elicited from Detective Lans, together with LeBlanc's narration of the video in which he appears, was sufficient to authenticate the videotape, we conclude that the trial court did not abuse its discretion in admitting the videotape in evidence.

### *James's chain of custody claim does not render the videotape inadmissible*

■ We reject James's argument that the evidence was inadmissible because of a chain of custody violation. Although it is the People's burden to lay the required foundation for authenticity and chain of custody of its evidence, "absent a showing of bad faith, ill will, or proof of tampering, the court operates under a presumption of integrity for the physical evidence." *United States v. Wilson*, 565 F.3d 1059, 1066 (8th Cir. 2009) (internal quotation marks and citation omitted). There must be a reasonable probability that the evidence has not been altered or tampered with. *Id.* There is not an iota of evidence that video tampering occurred in this case. A superimposed card game is not the kind of error that suggests tampering of the nature that James alleges.

■ Detective Lans testified that it was improbable that the original video was switched, tampered, or contaminated. Although Defense counsel challenged the authenticity of the videotape because of the superimposed card game, where there is no evidence indicating tampering, the possibility of tampering alone is not sufficient to render the videotape inadmissible. *United States v. Allen*, 106 F.3d 695, 700 (6th Cir. 1997). Rather, questions concerning the chain of custody do not go to the admissibility of the evidence, but rather to the weight of the evidence. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009). Moreover, where items have been in official custody and there is no affirmative evidence of tampering, there is a presumption that public officers have discharged their duties properly to preserve their original condition. *United States. v. Prieto*, 549 F.3d 513, 524-25 (7th Cir. 2008).

■ As demonstrated in the record before us, the superimposed card game does not indicate any nefarious tampering of the evidence, but rather that there was a minor error in copying the video surveillance

footage. Detective Lans testified that the videotape admitted at trial was the same as the one he created from the nightclub's surveillance equipment. (J.A. at 220.) He also testified that he was not aware of any defects in the tape surveillance. (J.A. at 225.) No contrary testimony was elicited during cross examination of Detective Lans or from any other witness. Therefore, any questions concerning the chain of custody of the videotape would not render the videotape inadmissible, but would be considered by the jury in terms of the videotape's accuracy and how much evidentiary weight to give the videotape. Although the People only wished to present approximately 10 minutes of the videotape, none of which showed the card game superimposed upon it, defense counsel was given the option of playing the entire videotape for the jury, including the portion with the superimposed game of solitaire. (J.A. at 217-19.) Because defense counsel was given the option to have the jury view the videotape in its entirety, including the parts with the superimposed card game, and declined that option, we cannot conclude that there was error because the jury was unable to see the muddled portion of the videotape and was, therefore, precluded from considering that portion of the video in giving the appropriate weight to the evidence.

██ Even if the videotape were inadmissible, there has been no showing that it was in any way prejudicial to the defendant, and there was more than sufficient evidence presented at trial independent of this recording, upon which the jury could convict James, as we describe in detail below. Thus there is no basis for finding that the trial court abused its discretion in admitting the videotape which was properly authenticated.[3]

---

[3] We further do not find meritorious James' argument that any alleged error in the videotape's admission was compounded by his defense counsel being substituted due to a conflict allegedly caused by the trial court. (Br. of Appellant at 17.) Firstly, James' contention that the trial court caused the scheduling conflict by appointing defense counsel to a case in Puerto Rico is unsupported by the record. *See* V.I.S.CT. R. 22(d) (mandating that all assertions of facts in the brief must be supported by a specific reference to supporting material in the record). Further, the record does not show that defense counsel requested a continuance which was denied, or that the court caused any sort of prejudice towards James in any manner with respect to the alleged scheduling conflict.

## B. The evidence at trial was sufficient to uphold the convictions on all counts

James next asserts that the evidence presented against him at trial was insufficient to convict him on any of the counts charged. He was convicted of attempted first degree murder, unauthorized use of a firearm during the commission of attempted first degree murder, third degree assault, and unauthorized use of a firearm during the commission of third degree assault.

Concerning his conviction for attempted first degree murder, James asserts that the People failed to establish that he attempted to commit the murder with premeditation as required for a finding of first degree murder. Title 14 § 922 of the Virgin Islands Code states in pertinent part that "all murder which . . . is perpetrated by means . . . or by any other kind of willful, deliberate and premeditated killing . . . is murder in the first degree." James contends that the evidence failed to confirm that he attempted to commit murder with premeditation or any kind of plan or mental reflection. However, established case law precedent negates this argument.

 The People are not required to prove that a defendant brooded over his plan to kill for any considerable period of time. *Gov't of the V.I. v. Lake*, 362 F.2d 770, 776, 5 V.I. 594 (3d Cir. 1966). Contrary to James' assertion on appeal, the People were not required to show that he harbored some long standing plan or intention to murder LeBlanc. As we have previously noted "although the mental processes involved must take place prior to the killing, a brief moment of thought may be sufficient to form a fixed, deliberate design to kill." *Nicholas v. People*, 56 V.I. 718, 734 (V.I. 2012) (internal quotation marks and citation omitted). It is not the length of time or reflection that determines whether an act of murder was premeditated, but rather it is the act of deliberation before the murder. *Id.* at 734.

 The evidence discloses that in response to LeBlanc's repeated statements and that he did not have the ten dollars to repay James, James informed LeBlanc that he possessed a gun. The evidence confirms that James moved behind a wall or partition in the restaurant and cocked his gun in preparation for using it. Thereafter, James immediately pointed the gun at close range at LeBlanc's face and shot him. These acts are sufficient to demonstrate that James had the requisite premeditation and

intent to murder LeBlanc. James' threat of having a gun, and his action of stepping behind a wall to cock his gun before re-approaching LeBlanc demonstrate that James possessed a "fixed, deliberate design to kill" LeBlanc. *Id.* In this case, LeBlanc made an attempt to avoid the confrontation with James, but James, as the aggressor, unrelentingly pursued LeBlanc and finally shot him. James' purposeful and deliberate conduct establishes that he reflected upon his actions, however briefly, prior to shooting LeBlanc in his face.

James's insufficiency of the evidence argument pertaining to Counts II and III also fails. Specifically, James takes issue with the fact that the videotape to which he objected was admitted in evidence and that most of the evidence came from LeBlanc, the victim witness, and James identifies what he believes to be contradictory testimony. However, after thorough examination of this record, we conclude that the videotape was properly authenticated, and the trial court did not abuse its discretion in admitting it into evidence. Further, there was evidence presented to the jury, independent of the videotape, that was sufficient to permit the jury to find James' guilt beyond a reasonable doubt. Such evidence includes the testimony of LeBlanc, the victim witness.

James claims that LeBlanc's testimony was contradictory because LeBlanc testified that the fight, which resulted in the shooting, erupted when he punched James, who had pointed a finger in LeBlanc's face. In addition, LeBlanc testified that he brandished his knife before James drew his gun. Firstly, in viewing the evidence in a light most favorable to the People, LeBlanc's testimony has not been shown to have been contradictory. LeBlanc maintained throughout his testimony that James was the initial aggressor. Further, when viewed in the light most favorable to the People, testimony from LeBlanc and other witnesses sufficiently established the elements of all the crimes charged. LeBlanc testified at trial that James truculently, pestiferously, and continuously followed him after he told James that he did not have the money to repay James and after LeBlanc attempted to retreat from the verbal altercation. (J.A. at 92-94.) Although LeBlanc admitted that he brandished a knife first, he stated that he did so only in response to James's threat that James had a gun. (*Id.* at 93-94.) LeBlanc further stated that he punched James in the face after James bellicosely pointed a threatening finger in his face which resulted in an offensive touching.

The testimony of Mercer concerning the motive for the shooting is also consistent with LeBlanc's testimony. Mercer testified that he overheard James say to LeBlanc "when you needed your stuff you come look for me, now it's time to pay me back, it's the principle about the money. When you suppose to come pay me back [sic], you didn't come." (J.A. at 130.) This testimony is consistent with LeBlanc's assertion that James shot him in the face in a dispute over a $10 debt. Contrary to James' assertion, LeBlanc did not provide contradictory testimony concerning who was the initial aggressor in the fracas between himself and James.

■ Generally, "[t]he testimony of one witness is sufficient to prove any fact . . . a conviction may be sustained on the testimony of a single witness or victim, even when other witnesses may testify to the contrary." 29A AM.JUR.2D *Evidence* § 1363. "The weight of the evidence is not determined by the number of witnesses who testify for either side, but the quality of their testimony." *Dunlop v. People*, S.Ct.Crim. No. 2008-0037, 2009 V.I. Supreme LEXIS 41, *12 (V.I. Sept. 15, 2009) (unpublished) (quoting *United States v. Handy*, 454 F.2d 885, 888 (9th Cir. 1971)). Therefore, the jurors, as the judges of the witnesses' credibility, were within their province to weigh the testimony of LeBlanc and find from that testimony that James committed the crimes charged.

■ Even if LeBlanc's testimony were contradictory, it would not provide a valid basis for this Court to invalidate the jury's verdict. We cannot usurp the role of the jury by re-analyzing, re-evaluating, or re-weighing the evidence presented at trial, or by determining the credibility of the witnesses. *See United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005); *Smith v. People*, 51 V.I. 396, 401 (V.I. 2009). Therefore, if the jury found LeBlanc to be credible despite any purportedly contradictory statements, we cannot disturb the credibility determination of the jury unless it is manifestly clear that the testimony cannot establish the elements for the crimes.

Here, the testimony of LeBlanc and other witnesses sufficiently established the elements of all the crimes charged when the testimony is viewed in a light most favorable to the People. The evidence establishes that James followed LeBlanc to the restaurant and demanded that LeBlanc repay his debt of ten dollars. (J.A. 91-93.) The evidence proves that James continued his pugnacious pursuit of LeBlanc to recover the 10 dollars debt after he was informed by LeBlanc that LeBlanc did not have the money to repay him. LeBlanc testified that James threatened him with

a gun, and LeBlanc responded by brandishing a knife. The evidence discloses that James retreated behind a partition in the restaurant and cocked his gun. (*Id.* at 94.) The evidence confirms that after a brief altercation, James shot LeBlanc in the face.

██ As we have previously discussed, this evidence establishes attempted first degree murder as charged in Count I. The shooting of LeBlanc directly in the face also establishes the charge of assault with a deadly weapon and the use of a deadly weapon during crimes of violence as charged in Counts II-III. Although no weapon was found, James' shooting LeBlanc in the face is established by LeBlanc's testimony and the testimony of Mercer stating that he heard James state that he had a gun, and a moment later heard gunshots being fired and saw James flee the scene of the crime. (*Id.* at 128-134.) Crime Scene Technician Deborah Mahoney testified that she retrieved a shell casing from the scene of the crime. (*Id.* at 161.) Also, Denise Berry, the custodian of medical records at the Hospital, testified that LeBlanc was admitted to the Hospital and was a patient for four days because of the gunshot wounds to the face on July 15, 2009. (J.A. 168-79). The jury heard testimony that James was not authorized to possess a gun in the territory.[4] (J.A. 182-84.) Accordingly, the evidence elicited at trial proved all the elements of the crimes charged; therefore, the evidence was sufficient to convict James of the crimes.

## V. CONCLUSION

For the reasons elucidated above, the Judgment and Commitment of the trial court dated July 29, 2011 is hereby **AFFIRMED**.

---

[4] At trial, a certificate of non-record showing that James did not possess a license to carry a firearm on St. Croix was admitted into evidence. Elfreda Robinson, Supervisor of firearm licensing, was allowed to testify regarding the St. Croix certificate of non-record although the search of records was performed by Karen Stout, who did not testify at trial. This presents a violation of the Sixth Amendment right to confront witnesses as espoused in *Crawford v. Washington*, 541 U.S. 36, 54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) and *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009); *Bullcoming v. New Mexico*, 131 S. Ct. 2705, 2714-16, 180 L. Ed. 2d 610 (U.S. 2011) had not yet been decided at the time of this trial. Because this issue was not raised on appeal before this Court it is deemed waived. V.I.S.CT.R. 22(m). *See also Nicholas*, 56 V.I. at 742 (issues that were perfunctorily raised in Appellate brief, but which were not sufficiently briefed in accordance with V.I.S.CT.R. 22(m), deemed waived).